[Sac. No. 7917. In Bank. Nov. 28, 1973.]

LEGISLATURE OF THE STATE OF CALIFORNIA et al., Petitioners, v.
ED REINECKE, as Lieutenant Governor, etc., et al., Respondents.

[Sac. No. 7919. In Bank. Nov. 28, 1973.]

EDMUND G. BROWN, JR., as Secretary of State, etc., Petitioner, v.
RONALD REAGAN, as Governor, etc., Respondent.

[Sac. No. 7923. In Bank. Nov. 28, 1973.]

THIRTY TWO MEMBERS OF THE UNITED STATES HOUSE OF REPRESENTATIVES, Petitioners, v.
RONALD REAGAN, as Governor, etc., et al., Respondents.

## COUNSEL

George H. Murphy, Legislative Counsel, Clinton J. deWitt, Deputy Legislative Counsel, and Herman F. Selvin for Petitioners in No. 7917.

Edmund G. Brown, Jr., Daniel Hays Lowenstein and Philip Neumark for Petitioner in No. 7919 and for Respondent Secretary of State in Nos. 7917 and 7923.

Wyman, Bautzer, Rothman & Kuchel, Thomas H. Kuchel and Frank Rothman for Petitioners in No. 7923.

Evelle J. Younger, Attorney General, Robert Burton, Assistant Attorney General, and J. M. Sanderson, Deputy Attorney General, for Respondent in No. 7919 and for certain Respondents in Nos. 7917 and 7923.

John V. Diepenbrock for Respondent Lieutenant Governor.

Robert S. Daggett, Brobeck, Phleger & Harrison, Richards, Watson & Dreyfuss, Glenn R. Watson, Robert N. Joehnck, Halley & Cornell, James W. Halley, David J. Levy, City Attorney (Pinole and Concord), James P. O'Drain, City Attorney (Richmond), Samuel V. McGrath, Deputy City Attorney, LaFollette, Johnson, Horgan & Robinson, James Dexter Clark, Chinello, Chinello & Maddy, Kenneth L. Maddy, Frank J. Pagliaro, Jr., Seth M. Hufstedler, John L. Burton, Putnam Livermore, Tinning & Delap, Austin R. Gibbons, David E. Schricker, City Attorney (Redwood City), John J. Gottes, City Attorney (South Gate), John Philip Coghlan, John D. Maharg, County Counsel (Los Angeles), Edward H. Gaylord, Assistant County Counsel, Ray T. Sullivan, Jr., County Counsel (Riverside), Richard W. Dickenson, County Counsel (San Joaquin), Monroe N.

Langdon, City Attorney (Stockton), Paul F. Mordy, Assistant City Attorney, Theodore R. Bresler, Deputy City Attorney, Keith C. Sorenson, District Attorney (San Mateo), James M. Parmelee, Deputy City Attorney, James M. Himmel, Cruz Reynoso, Peter Schilla, Peter H. Weiner, Lucy K. McCabe, Stanley Levy, Bruce Warner, Michael D. Saphier, Mario Obledo, Herman Sillas, Joe Ortega, Roberto Rabago, Armand Derfner, Royal M. Sorensen, City Attorney (Downey), Burke, Williams & Sorensen, Loren Miller, Jr., Dion G. Morrow, William T. Bagley, Arthur V. Azevedo, Gant & Asaro, Steven R. Jones, John J. Miller, Nathaniel S. Colley, Paul N. McCloskey, Jr., Gerald J. Lewis, City Attorney (Coronado), Robert W. Naylor, Erwin, Anderholt & Scherotter, J. John Anderholt, Albert E. Polonsky, Dawley, George & Holt, John George, Michael J. Halliwell, James P. Botz, County Counsel (Sonoma), Paul T. Bannai, Joseph W. Rainville, City Attorney (Glendale), Peter C. Wright, Deputy City Attorney, Reid, Babbage & Coil, John D. Babbage, James H. Harmon, County Counsel (Imperial), Byrd, Sturdevant, Nassif, McDaniel & Pinney, William Byrd, Charles F. Sturdevant, Jr., George N. Zenovich, John W. Holmdahl, Milton Marks, Lawrence E. Walsh, George W. Wakefield, Bernhard O'Connor, Frank Lanterman, John L. E. Collier, Mike D. Antonovich, Victor Veysey, Daniel V. Blackstock, Richard Wittenberg, Ignazio A. Vella, Henry J. Riboni, Gregory Jones, Jr., John A. Van Ryn, Stephen Reinhardt and Rudolph Dias on behalf of other interested parties.

## OPINION

**WRIGHT, C. J.**—In these mandate proceedings we are called upon to resolve the impasse created by the continuing failure of the Legislature to pass legislative and congressional reapportionment bills acceptable to the Governor.[1]

---

[1]In default of valid reapportionment legislation following the 1970 federal census the task of reapportionment is imposed upon us "to insure the electorate equal protection of the laws" (*Silver* v. *Brown* (1965) 63 Cal.2d 270, 282 [46 Cal.Rptr. 308, 405 P.2d 132]) and the right to equal participation in the election of United States Congressmen. (U.S. Const., art. I, § 2; *White* v. *Weiser* (1973) 412 U.S. 783, 790 [37 L.Ed.2d 335, 343, 93 S.Ct. 2348, 2352], and cases cited.) The vital importance of decennial reapportionment in a state such as California, which has experienced both substantial growth and shifts in population, may be illustrated by a comparison of the 1970 populations of existing assembly districts which were apportioned on the basis of the 1960 census. Thus, on the basis of the 1970 census there are now four assembly districts with populations that are approximately 37 percent below the ideal

Our first opinion herein was filed on January 18, 1972, when we adopted temporary apportionment plans for the 1972 elections. We concluded that the congressional districts set forth in Assembly Bill No. 16, 1971 First Extraordinary Session, and the existing statutes apportioning the Legislature should be in effect for the 1972 elections. We retained jurisdiction to draft new reapportionment plans for the elections of 1974 through 1980 in the event the Legislature did not enact valid legislative and congressional reapportionment statutes by the close of its 1972 regular session. (*Legislature* v. *Reinecke* (1972) 6 Cal.3d 595, 603-604 [99 Cal.Rptr. 481, 492 P.2d 385].)

On May 10, 1972, at the request of the Senate of the State of California, we postponed the time for further court action, stating that "we will not exercise our retained jurisdiction herein if the Legislature, in 1972, enacts valid legislative and congressional reapportionment statutes either during its current regular session or at a special session called for that purpose." (*Legislature* v. *Reinecke* (1972) 7 Cal.3d 92, 93 [101 Cal.Rptr. 552, 496 P.2d 464].)

The Legislature did not enact reapportionment statutes in 1972 and we were therefore again faced with the necessity of judicial action. On March 23, 1973, we announced our intention to appoint three Special Masters to hold public hearings to permit the presentation of evidence and argument with respect to the possible criteria of reapportionment and of proposed plans to carry out such criteria, to recommend to the court reapportionment plans for possible adoption, and to set forth the criteria underlying the recommended plans and the reasons for the recommendations. We made clear, however, that the Legislature was not foreclosed from enacting reapportionment statutes if it could succeed in doing so. We stated that "If at any time during the proceedings contemplated by this order valid congressional and legislative reapportionment measures are enacted the court will entertain an application to dismiss these proceedings." (*Legislature* v. *Reinecke* (1973) 9 Cal.3d 166, 168 [107 Cal.Rptr. 18, 507 P.2d 626].)

---

population, two districts with populations that are approximately 85 percent above the ideal, and two districts with populations that are approximately 71 percent above the ideal. Smaller but still substantial deviations exist in many other assembly districts. Comparable deviations in 1970 populations exist between senate districts and congressional districts that were apportioned on the basis of the 1960 census. Moreover, in the case of congressional districts the court was compelled to adopt a temporary reapportionment plan for the election of 1972 and must now adopt a permanent plan for the elections of 1974 to 1980 to provide for the additional five congressional seats that were allotted to California on the basis of the 1970 census.

On May 1, 1973, we appointed the Honorable Martin J. Coughlin, retired Associate Justice of the Court of Appeal, Fourth District, Division One, the Honorable Harold F. Collins, retired Judge of the Superior Court of Los Angeles County, and the Honorable Alvin E. Weinberger, retired Judge of the Superior Court of the City and County of San Francisco, as Special Masters, and we designated Justice Coughlin as Presiding Master. In accord with our order of March 23, 1973, we directed the Masters to present their recommendations to the court not later than August 31, 1973.

The Masters immediately undertook the task assigned to them, and on August 31 they filed their Report and Recommendations (hereinafter Report) with the court. During the course of the Masters' hearings the Legislature passed, but the Governor vetoed, Senate Bill 195, which contained congressional and legislative reapportionment plans. Since the Legislature has recessed for the year, it is now clear that the court has no alternative but to order its own reapportionment plans into effect.

With minor exceptions in senate district numbering (see fn. 2, *infra*), we accept and adopt the reapportionment plans recommended to us by the Special Masters. They are set forth in Appendix A to the Report, which, as corrected by the Masters for clerical errors, is on file with the clerk of the court. In the Report the Masters reviewed the evidence and arguments of the parties and other interested persons presented to them. They listed the criteria they deemed appropriate to govern reapportionment and the reasons underlying the selection of those criteria. They explained in detail why they could not recommend to the court any of the reapportionment plans presented to them and therefore concluded that they should formulate their own plans in accordance with the recommended criteria. Finally they described the method by which they drafted their plans, set forth to the extent feasible specific reasons underlying specific choices of district lines, and translated their conclusions into legal descriptions of legislative and congressional districts. The Report speaks for itself and follows as an appendix to this opinion. Accordingly, we will attempt to avoid as much as possible merely repeating what it contains.

After the Report was presented to the court, various parties and amici curiae filed briefs, and numerous cities, counties, groups, organizations, and individuals sent communications to the court objecting to or supporting the Masters' plans in whole or in part. Although some objection has been voiced to the Masters' conclusion that they should formulate their own reapportionment plans for recommendation to the court, we are fully persuaded by their Report (pp. 414-418, *infra*) that they correctly so con-

cluded. In so stating we wish to make clear that we in no way question the motives of the Legislature or any of its members in passing Senate Bill 195. We record only our agreement with the Masters that there are shortcomings in the reapportionment plans contained in that bill that preclude our adoption of them as court plans. We therefore now turn to a review of the Masters' plans.

The Masters adopted seven criteria which they used in formulating their plans. (Report, pp. 410-414, *infra.*) They may be summarized as follows: (1) The districts in each plan should be equal in population, with strict equality in the case of congressional districts and reasonable equality in the case of legislative districts. (2) The territory included within a district should be contiguous and compact. (3) Insofar as practical counties and cities should be maintained intact. (4) Insofar as possible the integrity of the state's basic geographical regions should be preserved. (5) The community of interests of the population of an area should be considered in determining whether the area should be included within or excluded from a proposed district so that all of the citizens of the district may be represented reasonably, fairly and effectively. (6) State senatorial districts should be formed by combining adjacent assembly districts, and, to the degree practicable, assembly district boundaries should be used as congressional district boundaries. (7) The basis for reapportionment should be the 1970 census, and in counties where census tracts exist, such tracts should be used as the basic unit for district formation.

Although many objectors contend that the Masters adopted too rigorous standards of population equality in the case of legislative districts or misapplied the second to fifth criteria in the formation of various congressional and legislative districts, there is broad agreement that the first five criteria are appropriate. For the reasons stated by the Masters (Report, pp. 412-414, *infra*), we are persuaded that the sixth and seventh criteria are also appropriate.

Some of the objectors contend that the Masters should have accepted rather than rejected the maintenance of existing relationships between incumbents and their constituencies as an additional criterion. We agree that there are values in maintaining such relationships and also in making it possible for competent incumbents to seek reelection without being placed in unduly disadvantageous positions. We agree with the Masters, however, that these values should not be pursued by designing district boundaries to promote the reelection of incumbents. Except in those relatively rare cases where population shifts are so extensive that it would be

difficult or impossible for particular incumbents to be reelected even under a proincumbent districting plan, incumbent-neutral districting will not preclude each incumbent from seeking reelection in a new district that will contain a substantial part of his former constituency. Moreover, each incumbent will retain the advantage of running as a sitting congressman or state legislator, as the case may be. To go further and to give incumbents the additional advantage of districting designed to preserve the status quo would be unfair both to nonincumbent candidates and to the electors of the new districts who wished to support such candidates.

We turn to the objections to the way in which the Masters resolved conflicts among their recommended criteria in drawing district lines. We are not bound by the Masters' resolutions of these conflicts. For the reasons which follow, however, we have concluded that we should approve the districts drawn by the Masters if they appear to reflect reasonable applications of the seven criteria, even though alternatives urged upon us may appear equally reasonable.

Any attempts that we might now make to redraw specific district lines to achieve possibly more reasonable results would run the serious risk of creating undesirable side effects which we could not foresee and which adversely affected parties could not call to our attention in time for corrections to be made. Moreover, that risk would necessarily be magnified by the fact that we are not in as advantageous a position as the Masters were in to assess the impact of possible alternatives.

The Masters and their staff and consultants spent four months in the intensive study and consideration of the arguments and evidence presented to them and in drawing and redrawing district lines in an endeavor to prepare reapportionment plans that adhered to the greatest extent possible to all of the recommended criteria. Although they did not have the benefit of the specific objections that have now been made to their plans, they were fully aware of similar or even greater objections made to the Legislature's plans that were vetoed by the Governor. They also had before them and carefully considered many proposals dealing with specific limited areas of the state, some of which have also been urged upon us. As they pointed out, however, "innumerable districts ideal for particular communities can be constructed if each is considered in isolation but when the entire state is divided into a specified number of districts, that which may appear ideal for one place or another must be subordinated to the goal of fair and reasonable reapportionment of the whole state. That is the goal

sought and upon which the recommendations to the Court are based." (Report, p. 417, *infra*.) In seeking that goal the Masters developed an expertise in the art of reapportionment that is attested to not only by the overall reasonableness and excellence of the plans they drafted but by the approval of those plans by legislators and congressmen affected thereby, many amici curiae, and others who have expressed themselves.

We have examined the Masters' plans in the light of all of the oral and written objections that have been made thereto, and we conclude that in every case the lines drawn represent reasonable applications of the recommended criteria.[2]

We turn to the consideration of whether elections for senator must be held in all 40 senate districts in 1974 or only in the 20 new even-numbered districts. Section 2, subdivision (a), of article IV of the California Constitution provides that "The Senate has a membership of 40 Senators elected for 4-year terms, 20 to begin every 2 years." (See also Elec. Code, § 30121, providing for even-numbered district elections in 1974, 1978, etc. and for odd-numbered district elections in 1972, 1976, etc.) If this constitutional provision is applicable following reapportionment those senators elected from odd-numbered districts in 1972 are entitled to serve four-year terms or until after the 1976 general election, and if vacancies occur in their offices they will be filled by elections in the districts in effect in 1972. (See *Sloan* v. *Donoghue* (1942) 20 Cal.2d 607, 609 [127 P.2d 922]; *New Democratic Coalition* v. *Austin* (1972) 41 Mich. App. 343 [200 N.W.2d 749, 755].) This provision is applicable following reapportionment unless it denies equal protection of the laws. (*People* v. *Pendegast* (1892) 96 Cal. 289, 294 [31 P. 103]; see also *People* v. *Markham* (1892) 96 Cal. 262 [31 P. 102].)

It is contended that to give continuing effect to the old odd-numbered districts for the purpose of allowing the incumbents therein to serve their full terms and for the purpose of filling any vacancies in such districts denies equal protection of the laws by invidiously discriminating among

---

[2]Since we hold below that elections for senator are to be held only in the 20 new even-numbered districts in 1974, we conclude that a more orderly transition from the old senate districts to the new senate districts would be achieved by interchanging the numbers of the Masters' proposed senate districts 8 and 9 and the numbers of the Masters' proposed senate districts 27 and 30. Accordingly, the plans set forth in Appendix A to the Masters' Report are amended to provide that senate district 8 shall be composed of assembly districts 14 and 15, that senate district 9 shall be composed of assembly districts 12 and 13, that senate district 27 shall be composed of assembly districts 51 and 52, and that senate district 30 shall be composed of assembly districts 49 and 50.

three groups of electors. Those electors who by redistricting are moved from an odd-numbered district to an even-numbered district were able to vote in a senatorial election in 1972 and will be able to vote again in a senatorial election in 1974, i.e., at a two-year interval. Those electors who after redistricting remain in an odd-numbered district or an even-numbered district, as the case may be, will have the opportunity to vote in a senatorial election at a four-year interval. Those electors who by redistricting are moved from an even-numbered district to an odd-numbered district will not have an opportunity to vote in a senatorial election until 1976, six years after they last could vote in a senatorial election in 1970.

This classification of electors may also be expressed in terms of the representation afforded in the Senate to the electors of the three groups. Electors of the first group who vote at a two-year interval will be represented by two senators for two years following reapportionment, electors of the second group who vote at a four-year interval will be represented by one senator regardless of reapportionment, and electors of the third group who vote at a six-year interval will be represented by no senator in whose election they could participate for two years following reapportionment.

These inequalities among groups of electors are the inevitable byproduct of reapportioning a legislative body whose members are elected for staggered four-year terms. Since these inequalities flow directly from provisions of the California Constitution, we are not free to obviate them unless they constitute invidious discriminations violative of the equal protection clause of the Fourteenth Amendment to the Constitution of the United States.

 It is now settled that as it applies to state electoral districting "the proper equal protection test is not framed in terms of 'governmental necessity,' but instead in terms of a claim that a State may 'rationally consider.' *Reynolds* v. *Sims, supra,* at 580-581." (*Mahan* v. *Howell* (1973) 410 U.S. 315, 326 [35 L.Ed.2d 320, 331, 93 S.Ct. 979, 986].) Although the *Mahan* case dealt with permissible deviations from strict population equality among districts, its rationale appears equally applicable to deviations from strict equality resulting from reapportionment coupled with staggered terms. The state may rationally consider stability and continuity in the Senate as a desirable goal which is reasonably promoted by providing for four-year staggered terms. The resulting inequality among electors is limited to the two-year period following reapportionment and results in even less temporary disenfranchisement than the up to four-year disenfranchisement that may be imposed on residents who move into a senate district or who become of voting age shortly after an election has taken place. To obviate the

inequality would substantially interfere with the orderly operation of the four-year staggered terms system after every reapportionment.[3] We conclude that adherence to staggered terms following reapportionment involved no invidious discriminations. (*Pate* v. *El Paso County, Texas* (W.D.Tex. 1970) 337 F.Supp. 95, 98-99, affd., 400 U.S. 806 [27 L.Ed.2d 38, 91 S.Ct. 55]; *Ferrell* v. *State of Oklahoma* ex rel. *Hall* (W.D.Okla. 1972) 339 F.Supp. 73, 82, affd., 406 U.S. 939 [32 L.Ed.2d 328, 92 S.Ct. 2045]; *Griswold* v. *County of San Diego* (1973) 32 Cal.App.3d 56, 62-64 [107 Cal.Rptr. 845], hg. den.)[4]

■ We turn to the durational residence requirement of subdivision (c) of section 2 of article IV of the California Constitution. It provides: "A person is ineligible to be a member of the Legislature unless he is an elector and has been a resident of his district for one year, and a citizen of the United States and a resident of California for 3 years, immediately preceding his election." The Masters recognized the problem that might be created by this provision if, as it has now turned out, the new district lines did not exist in time for incumbent candidates and other candidates to select a residence so as to become a resident of a district for a year preceding the election. They recommended that the court "give consideration to an interpretation that the cited section is inapplicable" in such case. (Report, p. 446, *infra*.) Their recommendation is sound. The constitutional provision contemplates that districts will be established for at least a year before the election, and since they were not so established, the provision by its own terms cannot apply. In the exercise of our equitable powers to fashion remedial techniques in this area of the law (see *Reynolds*

---

[3] In *People* v. *Pendegast, supra,* 96 Cal. 289, 295, the court pointed out the difficulties underlying the contention that elections should be held in all 40 senatorial districts following reapportionment. "And another consequence involved in this contention is, that not only must the constitutional term of the senators elected in 1890 be reduced by two years, but unless we are to abandon for all time the constitutional scheme of rotation in senatorial elections, the terms of one half of the forty senators chosen this year would have to be reduced to two years, in order that half of the senators might be chosen in 1894. But if this were to be done, how would it be done? and by what authority? The constitution contains no provision on the subject . . . ."

[4] We recognize that when the Legislature reapportioned the Senate in 1965 it provided that there should be an election in all 40 districts in 1966. (Elec. Code, § 30121.) That reapportionment involved the radical change from a territorial-based apportionment to a population-based apportionment, and in view of the gross population disparities among existing districts, equal protection may well have compelled the Legislature to terminate all existing senatorial terms immediately following the next election. It is significant, however, that the Legislature provided for the return to the four-year staggered term system after the 1966 election (Elec. Code, § 30121) and that it made no attempt to depart therefrom in its abortive efforts to achieve reapportionment following the 1970 census.

v. *Sims* (1964) 377 U.S. 533, 585 [12 L.Ed.2d 506, 541, 84 S.Ct. 1362]; *Silver* v. *Brown* (1965) 63 Cal.2d 270, 278 [46 Cal.Rptr. 308, 405 P.2d 132]), we hold that a person is eligible to be a member of the Legislature if he becomes a resident of the district involved by January 28, 1974, the first day for filing the declaration of intention to become a candidate pursuant to Election Code section 25500, and otherwise complies with election law requirements.

In concluding their Report the Masters stated: "A request has been received from the University of California Institute of Governmental Studies in Berkeley that its facilities be used as a depository of all material lodged with the Masters, with the understanding that the materials received will be safely stored, catalogued and made available for public and scholarly use. It is recommended, when the judgments in these actions become final, that pertinent materials that have been lodged with the Masters be released to the Institute of Governmental Studies for storing and use as requested, upon the conditions noted." (Report, p. 446.) We approve this recommendation and direct that it be carried out.

Since there is no reason to believe that any of the parties to these proceedings will not accede to our holdings herein, no purpose would be served by issuing writs of mandate. The alternative writ of mandate heretofore issued is discharged, and the petitions for writs of mandate are denied. Each party shall bear its own costs in the proceedings herein subsequent to the court's judgment on January 18, 1972.

This judgment is final forthwith.

McComb, J., Tobriner, J., Mosk, J., Sullivan, J., Clark, J., and Draper, J.,* concurred.

---

*Assigned by the Chairman of the Judicial Council.

## APPENDIX
## REPORT AND RECOMMENDATIONS
### OF
## SPECIAL MASTERS ON REAPPORTIONMENT

The Special Masters appointed by the Court in these cases were directed as follows:

"The Masters shall hold public hearings to permit the presentation of evidence and argument with respect to the possible criteria of reapportionment and of proposed plans to carry out such criteria.

"Following such hearings the Masters shall recommend to the court for possible adoption reapportionment plans which shall provide for 43 single member congressional districts, 40 single member Senate districts, and 80 single member Assembly districts. The Masters shall set forth the criteria underlying the plans they recommend for adoption and the reasons for their recommendations." (*Legislature* v. *Reinecke* (1973) 9 Cal.3d 166, 167 [107 Cal.Rptr. 18, 507 P.2d 626].)

Responding to a specific request for instructions the Court authorized the Masters to consider multimember district plans and ordered that if they "conclude that there are compelling reasons for adopting such multi-member districts, they may recommend plans containing such districts as possible alternates to the wholly single member plans they are to recommend for possible adoption."

Upon appointment, the Masters held organizational meetings; adopted a budget; and, with Court approval, employed a staff and retained consultants to assist in their work.[1]

Rules to govern the conduct of the public hearings and the submission of oral and written presentations were adopted. Hearings were scheduled in Sacramento, Los Angeles, San Diego and San Francisco, and written notice of the hearings was given to the parties to the actions and to others. A press release giving the times, places and purposes of the hearings was distributed statewide to the wire services, the major newspapers, and radio and television stations.[2]

---

[1]Paul L. McKaskle, a law professor at the University of San Francisco and an experienced attorney, was retained as counsel and staff supervisor; Gordon E. Baker, a professor of political science, and Perry L. Stauffer, a management consultant with computer data processing experience, were retained as consultants, and three research clerks and two secretaries were also employed.

[2]Declarations respecting the service of notice and furnishing the press release will be lodged with the Court.

A prehearing conference was held on June 6, 1973, following written notice thereof.

Thereafter, public hearings were held in the various cities, as scheduled, at which oral presentations were made.[3] Participating in one or more of the hearings were counsel for the parties or for other persons, organizations or political subdivisions, and individuals appearing on their own behalf or as representatives of groups, organizations, cities and counties. Exhibits used in support of those presentations were appropriately marked and made a part of the record.[4]

The oral and written presentations covered a wide range of subjects, some relevant to the issues at hand and others irrelevant or beyond the scope of the Court's directive to the Masters. Generally summarized, they urged the Masters, in preparing and adopting plans for recommendation to the Court, to consider specifically described criteria set forth; to reject all criteria except numerical equality of population and follow one of several proposed simplistic procedures; to change the number of legislative districts into which the state is divided by the Constitution; to eliminate all districts and effect the election at large of all legislators; to reject plans which would maintain the existing male character of the Legislature and adopt plans which would afford females an opportunity to be elected at the next election; and to reject plans which allegedly would dilute the voting strength of minority groups.

The most frequently voiced objection to all plans recommended by the Legislature, including the reapportionment plan for the Senate that the Governor found tolerable, was that those plans were designed primarily to favor incumbents and to obtain partisan advantage for one or the other of the major political parties. It was evident that there was widespread public cynicism about the political process, and it was frequently stated that the Masters were in a singularly advantageous position unavailable to legislators, who cannot escape the inevitable force of self-interest. Many who appeared expressed the belief that any plans promulgated by the Court or by the Masters would be less incumbent-oriented or politically motivated than the plans recommended by the Legislature or others with special interests in reapportionment.

---

[3]Transcripts of the prehearing conference and all hearings will be lodged with the Court.

[4]These exhibits and all written presentations will be filed and become a part of the record.

After the hearings began, the Legislature passed and the Governor vetoed Senate Bill 195, which contained congressional and legislative reapportionment plans. Both houses of the Legislature and 41 members of the congressional delegation urged that the plans set forth in Senate Bill 195 should be recommended to the Court because those plans represent reapportionments most nearly approximating appropriate political solutions. The Senate in particular urged that its plan contained in the bill should be recommended on the ground that the Governor had indicated that he would have approved that plan had it been presented to him in a separate bill. Certain minority assemblymen urged that as much of the assembly plan as did not meet with the Governor's disapproval be recommended, and they offered modifications of the rest of that plan designed to meet the Governor's objections. Similarly, 41 members of Congress offered modifications of the congressional plan contained in Senate Bill 195 to meet the Governor's objections. Underlying all of these proposals was the basic premise that "reapportionment is primarily a matter for the legislative branch of the government to resolve" (*Legislature* v. *Reinecke* (1972) 6 Cal.3d 595, 598 [99 Cal.Rptr. 481, 492 P.2d 385]) and the recently reiterated position of the United States Supreme Court that political solutions to reapportionment problems are not only entirely proper but indeed inevitable. (*Gaffney* v. *Cummings* (1973) 412 U.S. 735, 752 [37 L.Ed. 2d 298, 311, 93 S.Ct. 2321, 2331]; *White* v. *Weiser* (1973) 412 U.S. 783, 794-796 [37 L.Ed.2d 335, 345-346, 93 S.Ct. 2348, 2354-2355].)

Unlike the situation in the *Gaffney* and *White* cases, however, in these proceedings there are no duly enacted political solutions to be recommended to the Court but only "plans that are at best truncated products of the legislative process." (*Legislature* v. *Reinecke, supra,* 6 Cal.3d at p. 602.) Accordingly, in making their recommendations to the Court the Masters cannot escape the political thicket by seeking a compromise between legislative and gubernatorial views, a compromise that the Legislature and the Governor were unable to achieve. It is therefore concluded that the plans contained in Senate Bill 195 and in the proposed modifications thereof mentioned above cannot properly command any preferential consideration but must be measured for recommendation or rejection in whole or in part by the following criteria that the Masters determine to be appropriate for reapportionment. All other plans submitted by individuals or groups must likewise be measured by the objective criteria deemed to be appropriate.

## CRITERIA FOR REAPPORTIONMENT

Having considered the oral and written presentations, pertinent provisions of the Constitution of the United States and the Constitution and Statutes

of California, the case law expressed in judicial decisions, and authoritative sources in the field of political science, the following are recommended as the criteria to be used in formulating plans for reapportionment of legislative districts in California:

1. As required by the federal Constitution, the districts in each plan should be numerically equal in population as nearly as practicable, with strict equality in the case of congressional districts (*White* v. *Weiser* (1973) 412 U.S. 783, 790 [37 L.Ed.2d 335, 343, 93 S.Ct. 2348, 2352]), and reasonable equality in the case of state legislative districts (*White* v. *Regester* (1973) 412 U.S. 755, 763 [37 L.Ed.2d 314, 323, 93 S.Ct. 2332, 2338]; *Gaffney* v. *Cummings* (1973) 412 U.S. 735, 740-751 [37 L.Ed.2d 298, 304-311, 93 S.Ct. 2321, 2325-2330]; *Mahan* v. *Howell* (1973) 410 U.S. 315 [35 L.Ed.2d 320, 93 S.Ct. 979]). The population of senate and assembly districts should be within 1 percent of the ideal except in unusual circumstances, and in no event should a deviation greater than 2 percent be permitted.

Although a greater percentage variation has been permitted in the reapportionment plans of other states (see *Regester, Gaffney* and *Mahan, supra*) the populations of districts in such states were relatively small. Legislative districts in California are large, so that even a 1 percent or 2 percent variance in population affects a large number of persons.[5] The variance in the number of persons more directly relates to the practical attainment of numerical equality than does a percentage figure, and districts can be formulated in California pursuant to other criteria recommended without deviating from the ideal by more than 1 percent, except in unusual circumstances.

2. The territory included within a district should be contiguous and compact, taking into account the availability and facility of transportation and communication between the people in a proposed district, between the people and candidates in the district, and between the people and their elected representatives.

---

[5]The ideal size of legislative districts in *Regester, Gaffney* and *Mahan* ranged from 46,485 to 74,645. The ideal California assembly district has a population of 249,661 and a senate district, twice as much. In this connection it is worth noting that one reason advanced by the U. S. Supreme Court in *White* v. *Weiser, supra,* 412 U.S. 783, 790 [37 L.Ed.2d 335, 343, 93 S.Ct. 2348, 2352], for requiring stricter population equality standards for congressional districts was because an ideal congressional district generally had a much larger population than a typical legislative district. California state legislative districts are, perhaps, the only exception to this generalization.

3. Counties and cities within a proposed district should be maintained intact, insofar as practicable. (See Cal. Const., art. IV, § 6; *Silver* v. *Brown* (1965) 63 Cal.2d 270, 279 [46 Cal.Rptr. 308, 405 P.2d 132].)

4. The integrity of California's basic geographical regions (coastal, mountain, desert, central valley and intermediate valley regions), should be preserved insofar as practicable.

5. The social and economic interests common to the population of an area which are probable subjects of legislative action, generally termed a "community of interests" (cf. Gov. Code, § 25001) should be considered in determining whether the area should be included within or excluded from a proposed district in order that all of the citizens of the district might be represented reasonably, fairly and effectively.[6] Examples of such interests, among others, are those common to an urban area, a rural area, an industrial area or an agricultural area, and those common to areas in which the people share similar living standards, use the same transportation facilities, have similar work opportunities, or have access to the same media of communication relevant to the election process.

Most of the people making oral or written presentations urged consideration of the foregoing criteria in formulating proposed reapportionment plans. Many presentations were made urging adherence to the criteria of maintaining the integrity of counties and cities, and deploring needless division thereof in the formation of districts. It is clear that in many situations county and city boundaries define political, economic and social boundaries of population groups. Furthermore, organizations with legitimate political concerns are constituted along local political subdivision lines. Therefore, unnecessary division of counties and cities in reapportionment districting should be avoided.

6. State senatorial districts should be formed by combining adjacent assembly districts, and, to the degree practicable, assembly district boundaries should be used as congressional district boundaries.

Cogent reasons exist for the formation of senate districts from assembly districts. If assembly districts are formed logically and in compliance with the criteria recommended herein, then senate districts created by combining such districts are also likely to comply. This is particularly so if such an

---

[6]In *Reynolds* v. *Sims* (1964) 377 U.S. 533, 565-568 [12 L.Ed.2d 506, 529-531, 84 S.Ct. 1362, 1384], the Court said: "[T]he achieving of fair and effective representation for all citizens is concededly the basic aim of legislative apportionment."

eventual pairing is kept in mind when forming the various legislative districts. The resulting legislative districts will be more comprehensible to the electorate and the task of administering elections would be considerably simplified, thus saving money and insuring greater accuracy.

Similarly, use of assembly district boundaries to the degree feasible in formation of congressional districts will promote all of these advantages. Obviously, it is impossible to make all congressional district lines congruent with assembly district lines, since there are 43 congressional districts and 80 assembly districts, but in larger counties it is possible to use common boundaries in a substantial number of instances.

7. The basis for reapportionment should be the 1970 census. (Cal. Const., art. IV, § 6; *Silver* v. *Brown, supra,* 63 Cal.2d 270, 279.) In counties for which the United States Census Bureau has established census tracts, such tracts should be used as the basic unit for district formation, with division of such tracts being made only when necessary for population equality or to improve substantially compliance with other recommended criteria.

Census tracts are the basic unit used by the Census Bureau for measuring the characteristics of the population. Tracts average approximately 4,000 persons in size, and an effort has been made by the Census Bureau to make them homogeneous as to social characteristics and to use prominent natural or manmade geographical features as boundaries.[7] Thus, following, rather than disregarding, census tracts will aid in establishing natural, well defined legislative districts and will aid in obtaining valid pertinent socio-economic data about such districts.[8]

The use of whole census tracts makes it difficult to comply literally with another recommended criterion, that of maintaining the integrity of city boundaries. Some cities have exceedingly irregular boundaries with an odd assortment of "fingers" and "peninsulas" jutting out from the basic part of the city. In many such cases, the boundaries as of the date of the census

---

[7]See the explanation of the United States Bureau of Census on the development of census tracts in Appendix A of each PHC(1) publication on Standard Metropolitan Statistical Areas (e.g., PHC(1) - 190 relating to San Jose, California).

[8]Moreover, the population data available on the computer used by the Masters was on a census tract basis. It is possible to divide the population within census tracts by reference to various Census Bureau publications, maps and computer printouts. The nature of such maps and publications is such, however, that it is often a very time consuming process to divide a tract requiring numerous hand calculations with attendant numerous possibilities for error. To calculate, describe and check the relatively few census tract divisions contained in the plans recommended herein required dozens of hours of staff time.

do not reflect the present boundaries or what they are likely to be during the balance of the decade. Often census tract boundaries do not correspond exactly with the boundaries of such cities.[9] In such instances, census tract boundaries which preserve the bulk of the city in one district have been followed even though it resulted in trimming off small peninsulas or other such extensions of territory. This has been done only where the population affected was relatively small.

As to all of the recommended criteria, their applicability, priority and scope, other than population equality, depend on circumstances indigenous to the area under consideration. To the extent required by the federal Constitution, population equality controls.

### CONSIDERATION OF PLANS SUBMITTED BY THE LEGISLATURE AND OTHERS

As has been noted before, legislative plans for reapportionment, passed by the Legislature but vetoed by the Governor, were submitted for consideration. In addition, various individual legislators, local governmental groups and private groups or individuals submitted plans for reapportioning all or a portion of the state.

The plans submitted by the Legislature cannot be recommended for adoption.

The assembly plan and the congressional plan needlessly depart from the criteria of compactness and maintenance of county line and city line integrity.[10] A cursory examination of the assembly plan reveals numerous peculiarly shaped districts that very frequently cut city and county lines, often linking distant population area together while disregarding more proximate populations that could have been included. Governor Reagan's veto message cites many examples of particularly objectionable districts which are not compact and which needlessly cut city and county lines.

Like the assembly plan, the congressional plan contained in Senate Bill 195 violates the recommended criteria of compactness and respect for city and county lines. Some districts contain appendages linking distant population areas while frequently cutting city and county lines. Again, the Governor's veto message cites specific examples of the most objectionable districts. Forty-one members of the congressional delegation have

---

[9]In many instances, a single census tract has small portions of two cities within it.

[10]In one instance, the assembly plan was attacked for dividing the Spanish-surnamed group in the City and County of San Francisco.

also submitted a plan which they refer to as a "modification" of Senate Bill 195. While this plan does modify the congressional plan approved by the Legislature, and improves upon it in a number of aspects by cutting fewer county lines and city lines and increasing compactness, it was not passed by the Legislature and does not reflect the Legislature's approval of the modification. Furthermore, the Legislature is responsible for enacting a reapportionment plan, and this responsibility cannot be assumed by the congressional delegation.

Special consideration was given to the Senate plan because the Governor has indicated that he deems it acceptable and would have approved it had it been presented to him in a separate bill. The plan, however, needlessly departs from the recommended criteria of reasonable population equality, compactness and respect for county and city lines.[11] The Masters also conclude that no compelling reasons exist for formation of multi-member districts.[12]

Furthermore, the Senate plan raises grave constitutional questions involving population deviations and dilutions of voting strength of black and Spanish-surnamed persons. It is true that *Mahan* v. *Howell, supra,* 410 U.S. 315 [35 L.Ed.2d 320, 93 S.Ct. 979], upheld a population variance of 16.4 percent in a legislative redistricting plan where that variance was justified by a consistently applied state policy of preserving county lines. Nevertheless, the senate plan, which has a population variance of 16.5 percent, with 21 of the 40 districts deviating by more than 5 percent from the ideal, does not appear to meet the constitutional requirements

---

[11]Among the most unacceptable senate districts are Districts 8 and 9, which needlessly split numerous cities in San Mateo County; District 12, which links Stockton and Fresno while bypassing more proximate population concentrations; and District 18 which links a small part of the County of Santa Barbara, most notably the large university community of Isla Vista near the City of Santa Barbara, with Kern County by way of an unpopulated corridor in the form of a hook running through San Luis Obispo County to the Pacific Ocean and then south along the coast, bypassing populated areas enroute. District 18 lacks not only compactness but also a community of interest since the university community identifies closely with the City of Santa Barbara and not with Kern County. Indeed, an almost identical congressional district proposed by Senate Bill 195 (Congressional District 36) was criticized by the Governor's veto message as being severely defective.

[12]Senate Bill 195 proposes a multimember senatorial district composed of the City and County of San Francisco and the northern part of San Mateo County. Such a district would permit the San Francisco voters to elect two senators while substantially reducing the voting strength of the district's San Mateo County voters. While the 1965 Reapportionment Statute (Stats. 1965, Second Ex. Sess., ch. 3, p. 68, § 5), premised on the 1960 census, provided two senatorial districts for the City and County of San Francisco, its population, as indicated by the 1970 census, is no longer sufficient to form two senatorial districts and substantially comply with the equal population requirement.

implicit in *Mahan* v. *Howell* and in *White* v. *Regester, supra,* 412 U.S. 755 [37 L.Ed.2d 314, 93 S.Ct. 2332]. The Senate plan cannot be justified under *White* because it has substantially greater population variances than were allowed in *White*.[13] Even under *Mahan* the plan is suspect because of the absence of a rationally and consistently applied state policy such as preservation of county lines. While the Senate claims to have employed criteria such as county and city line preservation and community of interest recognition, it has not done so. The districts in the plan unnecessarily split cities and counties, often combine whole or partial counties across mountain ranges or bodies of water and disregard travel patterns, geography, common economic activities and other "community of interest" indicators.

There is also evidence that the Senate plan dilutes the voting strength of blacks and persons of Spanish surname by dividing homogeneous ethnic groups into a number of districts or by "packing" too many members of an ethnic group into a single district.[14] Despite assertions that the senate plan was not deliberately designed to discriminate or foster racialism, the Masters are persuaded that the senate plan is constitutionally suspect and should not be recommended to the Court.[15]

Finally, the Masters have concluded that the factor of overriding importance in each plan in Senate Bill 195 was the goal of incumbent re-

[13]In *White* v. *Regester, supra,* 412 U.S. 755 [37 L.Ed.2d 314, 93 S.Ct. 2332], a plan containing a 9.9 percent total deviation, and a 1.82 percent mean deviation, with only 2 percent of the districts deviating from the mean by more than 5 percent, was upheld without a rational state policy justification. The senate plan contains a 16.5 percent total deviation and a 4.66 percent mean deviation, with 52.5 percent of the districts deviating by 5 percent or more from the mean. These numerical differences, combined with the important fact that the ideal Texas district was 74,645 persons while the ideal California district is 499,322 persons, meaning that 4 or 5 percent deviations in California districts will create districts with drastic population variances, compel the conclusion that the cases are distinguishable.

[14]Substantial evidence was offered at the hearings that a deliberate attempt was made to reduce the effectiveness of black voters in District 31 by packing them into District 29. Prior to reapportionment, District 29 was 60 percent black and District 31 was 52 percent black. Despite the protests of Senator Dymally of District 29, the new plan increased his district to 73.7 percent black while reducing District 31 to 27 percent black. (Reptr. Tr., July 6, 1973, p. 182.) Furthermore, District 16, a so-called "Chicano" district in Los Angeles is actually a peculiarly shaped, elongated district that links only a part of the Spanish-surnamed community in Central and East Los Angeles with other areas in Los Angeles and San Bernardino Counties with whom those of Spanish surname share no community of interest. The district was severely criticized by individuals and organizations concerned with Spanish-surnamed interests as not really being so constituted as to give such interests substantial influence in a senatorial election.

[15]See *White* v. *Regester, supra,* 412 U.S. 755 [37 L.Ed.2d 314, 93 S.Ct. 2332].

election. While protection of incumbents may be desirable to assure a core of experienced legislators, the objective of reapportionment should not be the political survival or comfort of those already in office.[16] It is best if an incumbent's continuation in office depended upon effectiveness and responsiveness to constituents rather than upon the design of district boundaries. Extensive changes in constituencies necessitated by decennial redistricting are bound to affect most incumbents, who naturally value stability and predictability, and any reapportionment plan will make it necessary for some to work harder to become known to constituents.

All of the other reapportionment plans submitted have been carefully considered by the Masters. It is recognized that for each legislative body there are many potential plans that may pass constitutional muster and reflect roughly comparable apportionment wisdom. With one exception, the plans presented for statewide redistricting dealt only with one legislative body. Since one recommended criterion calls for an integrated approach to formation of assembly, senate and congressional districts, no plan for either house of the Legislature or for Congress was a particularly suitable vehicle for complying with this criterion. Further, lurking within proposed statewide plans may be dubious political considerations or implications that are not readily apparent and which may be difficult to detect and evaluate.[17] Because of these and other problems no statewide plan submitted for adoption is recommended. Several such plans contained valuable suggestions for resolving specific problems and all plans submitted were considered carefully in connection with the preparation of the recommendations.

Proposed plans that have been presented dealing with specific limited areas of the state have also been carefully considered. Proper weight was given to the reasons underlying such proposals. However, innumerable districts ideal for particular communities can be constructed if each is considered in isolation but when the entire state is divided into a specified number of districts, that which may appear ideal for one place or another must be subordinated to the goal of fair and reasonable reapportionment

---

[16]A plan that seriously jeopardizes most incumbents would not necessarily be in the public interest, but the advantage enjoyed by incumbents accruing from their former service and from name recognition makes it highly unlikely that most would be in serious jeopardy solely because of redistricting.

[17]For example, one congressional plan was the subject of extensive briefing pro and con on the issue of whether it would create a politically fair result.

of the whole state. That is the goal sought and upon which the recommendations to the Court are based.[18]

## PLANS RECOMMENDED FOR ADOPTION

Having concluded that plans presented either by the Legislature or others should not be recommended for adoption, the Masters formulated original plans in accordance with the criteria recommended herein.

For this task necessary documents were obtained from the United States Census Bureau and other sources. The basic data was placed in a computer maintained by the California Department of General Services. A terminal was installed in the office of the Masters, and was used to make the basic population calculations required for district formation.

The Census Bureau has issued periodic corrections to its initial population reports for California. These corrections were incorporated into the population data base and the districting was based on the census reports as corrected.[19] Based on the corrected census data the ideal populations for assembly, senate and congressional districts are 249,661, 499,322 and 464,486, respectively.

The legal descriptions of the recommended districts are contained in Appendix A of this report. Maps delineating these districts are contained in Appendix C of this report.[20] Statistical data is set forth in Appendix B of this report.

The first step in preparing reapportionment plans was to divide the state geographically into basic reapportionment areas. The next step was to divide each area into districts. This was done separately for assembly and congressional districts because of varying population requirements. What follows is a description of this process with respect to assembly district formation.

---

[18]Any person with even a passing acquaintance with reapportionment becomes aware of what is known as the "ripple effect," whereby the casting of one district on the water produces ripples felt throughout the state. If uncontrolled, this effect may result in the initial choice of a perfect district in one place leading to intolerably imperfect districts elsewhere.

[19]The net result of the corrections was a slight increase in total 1970 California population from 19,953,134 to 19,972,882.

[20]In the event that the maps and legal descriptions differ, the legal descriptions control. Should any such variances be brought to the attention of the Masters before these actions are concluded, a supplemental report resolving any inconsistencies will be filed with the Court. Finally, since the page size of this report and copyright problems preclude the use of some maps of greater clarity, supplemental descriptive maps will be lodged with the Court and be made available for public inspection.

Five such areas were created for the assembly plan. Initially they were formed out of whole counties and then were equalized so that each area's population was some multiple of an ideal assembly district.

Area I initially consisted of the 41 north coastal and interior Counties of Del Norte, Siskiyou, Modoc, Humboldt, Trinity, Shasta, Lassen, Tehama, Plumas, Mendocino, Glenn, Butte, Sierra, Lake, Colusa, Sutter, Yuba, Nevada, Sonoma, Napa, Yolo, Placer, Marin, Solano, Sacramento, El Dorado, Amador, San Joaquin, Calaveras, Alpine, Stanislaus, Tuolumne, Mono, Merced, Mariposa, Madera, Fresno, Kings, Tulare, Inyo and Kern.

Area II consisted of the San Francisco Bay Counties of San Francisco, San Mateo, Santa Clara, San Benito, Contra Costa and Alameda.

Area III initially consisted of the central coast Counties of Santa Cruz, Monterey and San Luis Obispo.

Area IV initially consisted of the central metropolitan area Counties of Santa Barbara, Ventura and Los Angeles.

Area V initially consisted of the southern California Counties of Orange, San Bernardino, Riverside, San Diego and Imperial.

To effect the population equalization in these areas the following modifications were made:

Area I was underpopulated. Therefore parts of the Mojave Desert region located in Los Angeles and San Bernardino Counties were added. The Mojave Desert sections of Kern County and Inyo County were already located in Area I. One advantage of this equalization was that it allowed a basic community of interest to be included within one assembly district.

Area III was underpopulated. Therefore a part of the City of Santa Maria, in Santa Barbara County, was taken from Area IV and added to Area III. Dividing the city was a practical necessity. Furthermore, as the bulk of the population in Area III is in Santa Cruz and Monterey Counties, the inclusion of the Santa Maria area, which has communities of interest similar to those of the cities in San Luis Obispo County, should produce a more effective representation of the population in the San Luis Obispo-Santa Maria area.

Area IV required a further deletion to remove its excess population, and Area V required an addition to offset the loss of population caused by deleting its Mojave Desert area. Therefore the City of Pomona was taken from Area IV and added to Area V. The City of Pomona is part of the

Pomona Valley region which consists of the Cities of Pomona, Claremont and La Verne in Los Angeles County and the Cities of Upland, Ontario, Montclair and Chino in San Bernardino County. Deletion of only the City of Pomona from Area IV was dictated by the equal population requirement.

The final step in formulating the assembly plan was to divide the reapportionment areas into assembly districts. The reasons underlying the formation of all districts was the application of the recommended criteria. A brief description of the districts together with some of the specific reasons which led to their formation are set forth below. Formation of district lines was a complex task and innumerable decisions had to be made at each stage of the process. In many instances, several false starts were necessary before a district could be formed which reasonably complied with the criteria and which would not interfere with the reasonable formation of adjacent districts. As the formation process proceeded, it was often necessary to go back to previously formed districts and readjust the boundaries to solve some theretofore unforeseen difficulty. This was particularly so in connection with the close population tolerances required for congressional districts.

ASSEMBLY DISTRICTS

AREA I

NORTHERN AND INTERIOR COUNTIES

(ASSEMBLY DISTRICTS 1 THROUGH 9, 26, 27, AND 30 THROUGH 34)

*Districts 1 and 3* are composed of 15 adjoining interior counties north of Sacramento which have a well developed internal road system and a total population of 508,905. Although the population in each district exceeds the ideal by almost 2 percent, the variance is justified because the region is relatively slow-growing and the two districts as one senatorial district maintain all of the counties intact.

District 1 consists of the eight intact counties of Siskiyou, Trinity, Shasta, Modoc, Tehama, Glenn, Lassen and Plumas and one-half of Butte County, the remainder of which is in District 3. The district economy consists of lumbering with agriculture in Butte, Glenn and southern Tehama Counties. Historically, it is similar to the present Assembly District No. 1.

District 3 consists of the six intact counties of Colusa, Sutter, Yuba, Sierra, Nevada and Placer and the remaining one-half of Butte County not included in adjoining District 1. Most of its population is in the north

Sacramento Valley agricultural areas of Colusa, Sutter, Yuba and Placer Counties.

*Districts 2, 8 and 9* consist primarily of northern coastal counties.

District 2 consists of the four intact counties of Del Norte, Humboldt, Mendocino and Lake, and a part of northern Sonoma County. The territory is known as the Redwood Empire and is linked by Highway 101. It is bordered on the west by the Pacific Ocean and on the east by mountains and is separated from the inland counties by mountainous terrain without major connecting highways. The included portion of north Sonoma County is an agricultural area and adjoins similar areas in Mendocino and Lake Counties.

District 8 consists of Napa County, a portion of Sonoma County, including all of the City of Santa Rosa and the Sonoma Valley, and the Vallejo portion of Solano County which is directly south of Napa County. The remaining portion of Solano County is located in the Sacramento Valley with coastal range hills dividing it from the Vallejo portion included in District 8. The people in District 8 share transportation and environmental concerns common to the San Pablo Bay Region.

District 9 consists of Marin County and the Petaluma region of Sonoma County to the north. The population of Marin County is 206,758 and of Sonoma County 204,885. The boundary of the former is the southwest boundary of the latter. Neither has sufficient population for an assembly district. The Petaluma region of Sonoma County was added to Marin County because it appears to be a developing semi-suburban extension of northern Marin County.

*Districts 4, 5 and 6* consist of the portion of Solano County within the Sacramento Valley, Yolo County, and most of Sacramento County.

Sacramento County has a population of 634,373 which exceeds the ideal size of two assembly districts by 135,051, requiring parts of the County to be joined with other areas in the formation of other districts.

District 4 consists of a portion of Solano County, Yolo County, and a portion of Sacramento County adjacent to Yolo County. The Sacramento portion has a population of about 60,000 and adjoins a suburban area in Yolo County. Its inclusion within the district is a practical solution to meet the equality of population requirement.

District 5 consists of the portion of Sacramento County located entirely north of the American River and includes a portion of the City of Sacramento.

The American River divides the City of Sacramento and marks a division of communities of interest.

District 6 consists primarily of the urbanized portion of Sacramento County south of the American River, plus a small portion of the Arden-Arcade District north of the American River, which could not be included in District 5 without creating a population imbalance.

*District 7* consists of the six intact mountain counties of El Dorado, Amador, Alpine, Colusa, Mono and Tuolumne, together with portions of Sacramento and San Joaquin Counties. As noted, Sacramento County is oversized for two assembly districts. San Joaquin County is oversized for one assembly district, and portions of these counties must be added to other districts. In large part the portions of Sacramento and San Joaquin Counties included in District 7 are rural and agricultural, with the exception of the City of Lodi, which shares the rural interests of the surrounding territory. The district also includes a small portion of the urban fringes of the southern part of the City of Sacramento and of the City of Stockton north of the Calaveras River.

*District 26* consists of the remainder of San Joaquin County not in District 7 and a portion of Stanislaus County including several small communities north and east of the City of Modesto. The San Joaquin County portion includes over 80 percent of the population of the City of Stockton and comprises most of the district. The territory is compact. The rural areas in both counties are devoted primarily to agriculture. The City of Stockton reflects both urban and rural interests, and in terms of influence is practically intact. The smaller communities are part of an agricultural economy.

*District 27* consists of the remainder of Stanislaus County not within District 26 including the Cities of Modesto and Turlock, and 94 percent of Merced County including the Cities of Merced, Livingston and Los Banos. The unincorporated areas in both counties are primarily agricultural. The interests of the incorporated areas relate mainly to agriculture.

*Districts 30 and 31* cover the region consisting of Fresno, Mariposa, and Madera Counties, and small portions of Tulare and Merced Counties. Fresno County, with a population greatly in excess of an ideal assembly district, must be divided. The population in the proposed districts, in both urban and rural areas, share common interests in tourism incident to recreational use of Yosemite, Kings Canyon and Sequoia National Parks, in agriculture and cattle raising, and in attendant interests in the con-

struction and maintenance of highways and the conservation and distribution of water.

District 30 consists of the portion of Merced County not included in District 27, the whole of Madera and Mariposa Counties, and a portion of Fresno County including a part of the City of Fresno.

District 31 includes the remainder of Fresno County and approximately 19 percent of Tulare County's population.

The division of the City of Fresno was necessitated as a practical solution to problems generated by redistricting on a statewide basis in conformity with the equal population rule.

*Districts 32 and 33* consist of Kings County, most of Tulare County, and a substantial part of Kern County, which must be divided because its population exceeds the size of an ideal assembly district. The rural areas of these two districts are mainly devoted to agriculture, with incident population interests in both rural and the urban areas.

District 32 includes Kings County, most of Tulare County, and a small part of Kern County, which is added to effect population equalization. The district includes, among others, the intact Cities of Hanford, Visalia, Tulare, Porterville and Delano.

District 33 is located entirely within Kern County and consists of the territory west of the Tehachapi Mountains centered around the intact City of Bakersfield.

*District 34* is composed of the Mojave Desert portions of Kern, Los Angeles and San Bernardino Counties, and all of Inyo County and consists generally of desert and mountain areas which, for the most part, are sparsely populated. Over 90 percent of the population is located in the comparatively compact area bounded by Palmdale and Lancaster in Los Angeles County, Edwards Air Force Base in Kern County, and Barstow and Victorville in San Bernardino County. This area contains an airplane manufacturing installation in the Antelope Valley, Edwards Air Force Base, which straddles the Kern-Los Angeles County line, Palmdale Air Force Base in Los Angeles County, China Lake Naval Air Station in Kern County, and Fort Irwin, George Air Force Base and the Barstow Marine Base in San Bernardino County, all constituting a community of interest. Two other population centers in the district, at Bishop in Inyo County, and at Needles in San Bernardino County, each with an approximate population of 5,000, are as distant from any other population centers as from the center of the district, and both are on major transportation links with other population centers in the district.

## AREA II

### SAN FRANCISCO BAY COUNTIES
### (ASSEMBLY DISTRICTS 10 THROUGH 25)

*Districts 10 and 11* are wholly within Contra Costa County and contain 90 percent of the county's population.

District 10 consists of the eastern part of Contra Costa County, including intact the Cities of Antioch, Pittsburg, Walnut Creek and 97 percent of the population of the City of Concord.

District 11 consists of the western part of Contra Costa County, including intact the Cities of Richmond, El Cerrito, Martinez and Pleasant Hill, and one census tract from the City of Concord. The minor division of Concord was necessary to comply with the equal population requirement.

*Districts 12, 13, 14 and 15* include all of Alameda County except the City of Fremont.

District 12 consists of a part of Alameda County and about 10 percent of Contra Costa County's population. Alameda County in District 12 includes the City of Albany, the part of the City of Berkeley encompassing the hills and the University of California campus and environs, and the part of the City of Oakland generally lying east of Telegraph Avenue and the Grove-Shafter and MacArthur Freeways. Included in District 12 from Contra Costa County are the City of Lafayette, and the unincorporated communities of Orinda and Moraga. According to the census, the place of employment for most of the residents of this part of Contra Costa is in Alameda County, with which it is linked by the Bay Area Rapid Transit System.

District 13 includes part of the City of Berkeley and part of the City of Oakland and the whole of the City of Alameda. The part of the City of Berkeley included in District 13 has a majority of black residents and 90 percent of the black residents of Berkeley. Since 1940, in forming an assembly district, this part of Berkeley has been linked with the black community in the included part of the City of Oakland. Though the City of Berkeley is divided, the proposed composition of District 13 minimizes the dilution of the black population and has historical precedent. Furthermore, the Cities of Oakland and Berkeley merge without any physical barrier, and the district is reasonably compact.

Districts 14 and 15 consist of the southern part of Alameda County, with the exception of the City of Fremont.

District 14 includes portions of east Oakland not included in Districts 12 and 13, plus the intact City of San Leandro and most of the unincorporated area known as Castro Valley.

District 15 includes the intact cities of Hayward and Union City, plus the Livermore and Pleasanton areas, with which Hayward is linked by Interstate Highway 580.

*Districts 16, 17 and 18* include all of the City and County of San Francisco plus a part of San Mateo County needed to form three assembly districts meeting the equal population requirement.

District 16 includes the San Francisco areas known as Downtown, Chinatown, Mission, Potrero and Hunter's Point. The district abuts San Francisco Bay and includes Treasure Island. Within the district are three distinct and separated areas in which three minority racial groups are concentrated. The population of Chinatown is Asian. A major part of the population in the Mission consists of people with Spanish surnames, referred to as "Latinos." A large group of blacks, which is one of three such groups in widely separated parts of the City, reside in Hunter's Point.

District 17 includes the San Francisco areas known as the Marina, Pacific Heights, Fillmore, Haight-Ashbury and Richmond districts, and includes a comparatively small but concentrated Asian population, as well as the largest concentration of the city's black population.

District 18 includes the remainder of San Francisco consisting of the areas known as Outer Mission, Ingleside, St. Francis Woods and Sunset plus a portion of Daly City and an unincorporated "island" surrounded by Daly City, located in San Mateo County. The addition of the San Mateo County area was necessary to achieve population equality.

*Districts 19 and 20* are located entirely within San Mateo County. Because the county exceeds the population size of two ideal assembly districts by 57,911 people, a small area on each end of the county is attached to districts in adjoining counties. Thus, an area in the north is joined in a district with part of the City and County of San Francisco, and an area in the south is joined in a district with part of Santa Clara County. District 19 comprises the northern half of the county, and District 20 the southern half. The county consists of many cities with similar political-

economic interests. All cities within the two districts are maintained intact, with the following exceptions:

(1) The City of San Mateo which is divided on the east-west basis by the boundary line common to both districts; and (2) the cities of Daly City and Menlo Park, portions of which are, by necessity, in adjoining districts.

*Districts 21, 22, 23, 24 and 25* include all of Santa Clara and San Benito Counties, plus the City of Fremont in Alameda County and a small portion of San Mateo County. The population of Santa Clara County, which has sustained substantial decennial population growth, although exceeding the population requirement of four ideal assembly districts is less than the requirement for five districts. The population in the added territory is needed to complete the additional district. The combined areas gain two assembly districts.

District 21 is centered along the Bayshore Freeway, El Camino Real and the Southern Pacific commuter line in the northwestern part of Santa Clara County and includes the intact Cities of Palo Alto and Mountain View, over 90 percent of the population of the City of Sunnyvale, and the excess population of San Mateo County adjoining Palo Alto, contained in the unincorporated area of East Palo Alto and in a part of the City of Menlo Park.

District 22 consists of the suburban area southwest of the center of San Jose, including the intact Cities of Los Gatos, Saratoga, Campbell, Cupertino, Los Altos and Los Altos Hills, and some of the westerly extension of San Jose.

The principal city in Santa Clara County is San Jose. Its boundaries are extremely irregular, and include many peninsular extensions which preclude utilization for district boundary purposes. As a result, parts of San Jose were included in four of the five Santa Clara County assembly districts.

District 23 includes the center of San Jose and the intact City of Santa Clara which, respectively, includes the college communities of California State University at San Jose and the University of Santa Clara. It is essentially urban in political-economic interests and is compact.

District 24 consists of the southerly parts of San Jose, including the Evergreen, Edenvale and Almaden areas. It also includes the southeastern part of the County of Santa Clara and the whole of San Benito County. This district contains much of the Santa Clara County agricultural production.

District 25 consists of the northerly portion of San Jose east of U. S. Highway 101 and the intact City of Fremont in Alameda County on the northern border of Santa Clara County.

## Area III

### Central Coastal Counties
### (Assembly Districts 28 and 29)

*Districts 28 and 29* are composed of the central coastal counties of Santa Cruz, Monterey and San Luis Obispo, plus a portion of the City of Santa Maria in Santa Barbara County added to equalize population.

District 28 consists of the intact County of Santa Cruz and the Monterey Bay portion of Monterey County, including all of the cities in the Monterey peninsula from Carmel to Seaside. The territory is compact and consists of coastal and mountain regions devoted to recreation uses which have a community of interest incident to such uses.

District 29 consists of the remaining part of Monterey County not within District 28, including Fort Ord, except the part within the City of Seaside and the cities in the Salinas Valley, together with all of San Luis Obispo County and part of Santa Maria. It consists of coastal and inland agricultural areas throughout and thus has a basic community of interest. District 29 is almost 2 percent under the population for an ideal assembly district to avoid dividing cities contained in District 28.

## Area IV

### Central Metropolitan Counties
### Of Los Angeles, Santa Barbara and Ventura
### (Assembly Districts 35 through 64)

This area, consisting largely of Los Angeles County, contains 30 assembly districts.

*Districts 35 and 36* include the portion of Santa Barbara County remaining after a portion of the City of Santa Maria was used to equalize the central coast area population, plus the major portion of Ventura County.

District 35 is the Santa Barbara portion. It is underpopulated by more than 1 percent, but less than 2 percent of the ideal. This could be corrected by taking part of one census tract in the City of Ventura in Ventura County. This was deemed undesirable for geographic and community of interests

reasons, since the tract taken would have been remote from the remainder of the district.

District 36 includes all of Ventura County west of the Conejo Grade, a traditional dividing point of the County located on Highway 101.

*Districts 37, 38, 39 and 40* are wholly or partly located in the San Fernando Valley.

District 37 includes the Newhall area, which is north of the Valley proper, the Sylmar, Granada Hills and Chatsworth areas of the Valley, and the Simi Valley in Ventura County, which is connected to Chatsworth by the Simi Freeway. The City of Fillmore in Ventura County, which is down the Santa Clara River from the Newhall area, is also in the district. The Fillmore area was included, since it was deemed undesirable and unnecessary to split the City of Camarillo.

District 38 includes the Malibu and Palisades areas of the north Los Angeles County coast, the Woodland Hills and Canoga Park areas of the San Fernando Valley, and the Thousand Oaks area of Ventura County. The Ventura County portions included in Districts 37 and 38 were divided because the Simi Valley area relates to the Chatsworth area via the Simi Freeway, whereas the Thousand Oaks area relates to the Canoga Park-Woodland Hills area via the Ventura Freeway.

District 39 lies entirely within the eastern San Fernando Valley, including Pacoima and the Northridge areas.

District 40 lies immediately south of District 39 and includes much of the North Hollywood, Van Nuys and Reseda areas of Los Angeles County.

*Districts 41 and 42* include all of the Cities of Glendale, Burbank, Pasadena and South Pasadena, plus adjacent portions of Los Angeles City or County, such as Sunland, Tujunga, La Canada, La Crescenta, and Altadena.

District 41 includes Burbank, Glendale and Tujunga. Glendale, the fourth largest city in Los Angeles County, is split between Districts 41 and 42, with the central portion being included in District 41.

District 42 includes the remainder of Glendale, primarily the northern portion which is somewhat removed from the central portion of the city, plus La Canada, Pasadena and South Pasadena.

*Districts 43, 44, 45 and 46.* The area comprising these districts includes the Santa Monica mountain region, the Hollywood-Wilshire area, western Los Angeles, and a small part of the San Fernando Valley.

District 43 includes the Encino, Westwood, Bel Air and Brentwood areas of Los Angeles and the entire City of Beverly Hills. While straddling the mountains in the north regions, the district is centered on the San Diego Freeway between Encino and Westwood, and thus follows a transportation corridor.

District 44 includes the entire City of Santa Monica, and the Venice area of Los Angeles immediately adjacent to the south. The district extends inland along the Santa Monica Freeway into the Mar Vista, Palms and Cheviot Hills area of Los Angeles.

District 45 includes the Fairfax and West Hollywood areas of central Los Angeles, the Hollywood Hills and the Studio City areas and a portion of the North Hollywood area of the southeastern San Fernando Valley, The Hollywood Freeway route between the San Fernando Valley and central Los Angeles is included in the district.

District 46 lies just to the east of District 45, including the Wilshire, Silver Lake and Los Feliz areas of Los Angeles.

*Districts 47, 48, 49 and 50.* The region encompassed by these districts is south central Los Angeles and nearby smaller cities. The heaviest concentration of black residents in Los Angeles County is contained in this region.

District 47 includes the area of the City of Los Angeles surrounding the University of Southern California, together with the whole of Huntington Park, Bell and Cudahay.

District 48 includes the Watts area and the entire City of South Gate.

District 49 includes the entire City of Culver City and the Del Rey and Crenshaw areas of Los Angeles City, together with the unincorporated part of Baldwin Hills.

District 50 includes the Westchester and South Vermont areas of Los Angeles and the entire City of Inglewood.

*Districts 51, 52, 53, 54, 57 and 58.* These districts include the southern part of Los Angeles County, including the Long Beach and Torrance areas.

District 51 includes the chain of "South Bay" cities from El Segundo to Redondo Beach, plus a coastal portion of Torrance and the Palos Verdes Peninsula. Because of its geographic position, the whole of Torrance could not be included in one assembly district while still meeting other recommended criteria. District 51, as proposed, joins the coastal part of Torrance with other coastal cities.

District 52 includes the two inland portions of Torrance, the San Pedro and Wilmington areas of the City of Los Angeles, plus adjacent unincorporated areas.

District 53 includes the whole of Hawthorne and Gardena and an area containing about one-half of the population of the recently incorporated City of Carson.

District 54 includes all of the Cities of Compton, Paramount, Lynwood and Bellflower.

Districts 57 and 58 include all of Long Beach and Lakewood, plus the remaining portion of Carson. Long Beach, with a population exceeding that of one assembly district, is divided, with east Long Beach being joined with Lakewood and west and north Long Beach with Carson.

*Districts 55, 56, 59 and 60.* These four assembly districts include, generally, the areas containing a large Spanish-surnamed population in Los Angeles County.

District 55 contains the eastern part of Los Angeles City, including Eagle Rock, Lincoln Heights, and part of Boyle Heights, together with a part of the unincorporated area of East Los Angeles.

District 56 includes downtown Los Angeles, the remainder of Boyle Heights and East Los Angeles, plus the entire Cities of Commerce and Bell Gardens.

District 59 is made up of five entire cities in the western San Gabriel Valley: Alhambra, Monterey Park, Montebello, Pico Rivera and South El Monte.

District 60 consists of the entire Cities of Rosemead, El Monte, Baldwin Park, and La Puente and adjacent unincorporated areas in the central San Gabriel Valley.

*Districts 61 and 62.* These two districts are made up principally of smaller north San Gabriel Valley area cities.

District 61 includes the Cities of San Gabriel, San Marino, Arcadia, Monrovia, Duarte, Azusa, Bradbury and Temple City.

District 62 includes the Cities of Glendora, Covina, West Covina, San Dimas, La Verne, and Claremont.

*Districts 63 and 64.* These are the last two districts wholly within Los Angeles County.

District 63 includes the whole Cities of Downey, Norwalk, Sante Fe Springs, Artesia and Cerritos.

District 64 includes the whole Cities of La Mirada and Whittier, plus the unincorporated areas of Hacienda Heights and Diamond Bar. Although this district is somewhat elongated, it is centered around Whittier and La Mirada on the south side of a range of hills and Hacienda Heights and Diamond Bar on the north side. Hacienda Heights and Diamond Bar have been joined together with Whittier in past assembly districts and are linked by Colima Drive, a four-lane highway over the intervening hills, and by the San Gabriel and Pomona Freeways, which generally form the north and northwest boundaries of the district.

## AREA V

### SOUTHERN CALIFORNIA COUNTIES
### (ASSEMBLY DISTRICTS 65 THROUGH 80)

*District 65* consists of territory in the Pomona Valley and includes intact the City of Pomona in Los Angeles County and the whole Cities of Upland, Ontario, Montclair and Chino, together with adjacent unincorporated areas, in San Bernardino County. The district is compact and is a new district resulting from increases of population in the area. The unincorporated areas are used for agricultural and related purposes.

*District 66* is wholly within San Bernardino County and consists of the intact Cities of Colton, Fontana and Rialto, and the major part of the City of San Bernardino. A small part of the northern and eastern edges of the City of San Bernardino are in District 67, similar to an existing division of the city. The bulk of the district's population is in the cities, which are industrial and residential. The adjoining unincorporated areas are used for agricultural and associated purposes.

*District 67,* in addition to the portion of San Bernardino not included in District 66, is composed of (1) the northern communities of Crestline,

Lake Arrowhead and Big Bear Lake, interspersed with other resort areas, (2) the southeastern Mojave Desert area of Twentynine Palms, in San Bernardino County and (3) the eastern San Bernardino County areas of Loma Linda, Highland, Redlands and Yucaipa, together with the Riverside County areas of Beaumont, Banning, Sunnymead, San Jacinto and Perris, all of which are parts of extended agricultural areas.

*District 68* is wholly within Riverside County and includes the intact Cities of Corona, Norco and Riverside, with adjacent unincorporated areas including March Air Force Base, and corresponds almost exactly to its counterpart in Senate Bill 195.

*Districts 69, 70, 71, 72, 73 and 74* include all of Orange County, which is composed largely of cities, and a small part of San Diego County required to equalize population.

The City of Anaheim is the largest city in Orange County, stretching almost across the county. It is divided rather than dividing smaller, more compact cities.

The county was divided geographically into three parts. The cities in the interior region are in Districts 69 and 70; those in the central region are in Districts 71 and 72; and those in the coastal region are in Districts 73 and 74.

*Districts 69 and 70,* except for a part of Anaheim, are located almost entirely east of the Santa Ana Freeway. District 69 includes intact the Cities of La Habra, Fullerton and Brea, and 60 percent of the population of Anaheim. District 70 includes intact the Cities of Orange and Tustin and 30 percent of the population of Anaheim.

*District 71* includes most of the medium and smaller sized cities of central Orange County, such as Buena Park, Cypress, La Palma, Los Alamitos, Stanton and Westminster, and small western peninsular portions of Anaheim and Garden Grove.

*District 72* includes all of the City of Santa Ana, the second most populous city in the county, and the bulk of Garden Grove, the third most populous city in the county.

*District 73* includes all of the coastal cities of Seal Beach, Huntington Beach, more than 80 percent of the population of the City of Costa Mesa, and all of the adjacent interior City of Fountain Valley. The division of Costa Mesa, necessitated to achieve population balance, does not dilute its political effectiveness as a part of the District.

*District 74* includes, in addition to the remaining population of Costa Mesa, all of the coast cities of Newport Beach, Corona Del Mar, Laguna Beach, San Juan Capistrano, San Clemente, and other south county coastal communities, the Irvine Ranch area, a portion of San Diego County consisting of most of the City of Oceanside and the United States Marine Base at Camp Pendleton. One census tract is excluded from Oceanside to maintain population balance.

*District 75* consists of all of Imperial County, the mountain and plateau region in the southeastern part of Riverside County, including the communities of Idyllwild, Hemet, Elsinore, Temecula and Rancho California, the Palm Springs-Coachella Valley regions in the eastern part of Riverside County, and a portion of the mountain and plateau region in San Diego County south of and adjoining a similar region in Riverside County. The population base area of District 75 is similar to that of the existing district. Additions to the latter were necessary to equalize population.

*Districts 76, 77, 78, 79 and 80* are entirely within San Diego County where the districting process commenced at the Mexican border. The population of the County substantially exceeds the ideal for five assembly districts. As a consequence, the Oceanside and Camp Pendleton areas were excluded and joined with Orange County areas.

*District 76* is composed of the coastal communities of La Jolla, Del Mar, Solano Beach, Cardiff-by-the-Sea, Encinitas and Carlsbad, the retirement community of Rancho Bernardo and the interior communities of Rancho Santa Fe, Poway, San Marcos, Vista, Escondido and Ramona. La Jolla and Rancho Bernardo are a part of the City of San Diego, which because of its large population must be divided. All other cities in the district are intact.

*District 77* includes the communities of Clairemont and Miramar in the northeastern part of the City of San Diego, the whole Cities of La Mesa and El Cajon, each of which join eastern parts of San Diego, and other surrounding communities. The areas in the district are mainly suburban.

*Districts 78, 79 and 80* correspond generally, although not exactly, to the three existing districts, and are fairly compact in arrangement, comply with the population requirement and include the major part of the City of San Diego and the Cities of Coronado, National City, Chula Vista and Imperial Beach.

## SENATORIAL DISTRICTS

As previously indicated, senate districts were formed by pairing adjacent assembly districts. Consideration was given in the assembly district line drawing process to the need to combine assembly districts into senate districts. Thus, in most instances, appropriate combinations are fairly obvious. A brief description of the pairings and the reasons therefore follow:

*District 1*: Assembly Districts 1 and 3. This district covers all of interior California north of Sacramento. It is approximately square, and reunites Butte County, the one county divided by the two assembly districts.

*District 2*: Assembly Districts 2 and 9. This is a coastal district encompassing the Redwood Empire and Marin County. The major transportation corridor is Highway 101, with extensive auto and bus traffic. The combination partially reunites Sonoma County.

*District 3*: Assembly Districts 5 and 6. This district is wholly within, and constitutes most of, Sacramento County.

*District 4*: Assembly Districts 4 and 8. This district lies in the suburban and semi-rural areas between the San Francisco Bay Area and Sacramento. About 60,000 people in Sacramento are included. The district is rather compact and includes similar types of agricultural activities in the coastal range valleys in Sonoma and Napa Counties and the southern portion of the Sacramento Valley in Solano and Yolo Counties.

*District 5*: Assembly Districts 16 and 17. This district joins the two northernmost assembly districts in San Francisco.

*District 6*: Assembly Districts 18 and 19. Assembly District 18 is the southernmost San Francisco assembly district and includes a small portion of San Mateo County. Assembly District 19 is the northern part of San Mateo County.

It is possible, of course, to pair assembly districts in the San Francisco area to avoid dividing San Mateo County into two senate districts and efforts were made to devise pairings of districts that would accomplish this end. Any rational plan which united San Mateo County in a single senate district simply divided other, smaller counties such as San Joaquin, Monterey and Kern Counties and had an additional defect of combining either a coastal assembly district with a central valley district or a rural assembly district with part of Los Angeles. It was decided that a division of San Mateo County was a more acceptable solution.

*District 7*: Assembly Districts 10 and 11. This district is wholly within Contra Costa and constitutes 90 percent of the population of the county.

*District 8*: Assembly Districts 12 and 13. This district contains all of northern Alameda County including all of the smaller north county cities and the bulk of Oakland plus a small portion of Contra Costa County.

*District 9*: Assembly Districts 14 and 15. This senate district covers all of Alameda County not in District 8 except for the City of Fremont, which is part of Assembly District 25 and included as part of a Santa Clara County district.

*District 10*: Assembly Districts 20 and 21. Except for a few thousand people along the very lightly populated San Mateo Coast, this senate district is centered on the Bayshore Freeway-SP commuter rail line ranging from San Mateo to Sunnyvale with a geographical center in the Palo Alto-Menlo Park area. San Mateo County is divided between Districts 6 and 10, but much of the northern part of the county in District 6 is a bedroom community for San Francisco, whereas the southern part of the county in District 10, particularly the Menlo Park-Atherton area, has strong ties to the Palo Alto region of Santa Clara County with its research centers and electronics industry.

*District 11*: Assembly Districts 24 and 25. This senate district contains the eastern part of Santa Clara County, the City of Fremont in Alameda County, and San Benito County. The district includes much of the City of San Jose and is served by the Nimitz Freeway and Highway 101, which run the length of the district. The southern part of the district includes the agricultural areas of Morgan Hill and Gilroy.

*District 12*: Assembly Districts 22 and 23. This district includes the central and southwest portions of Santa Clara County and is largely suburban. Most of the medium sized cities in the county (e.g., Santa Clara, Los Gatos, and Cupertino) are in the district along with some of the City of San Jose. The Los Gatos Freeway and Junipero Serra Freeway provide the major transportation links in the district.

*District 13*: Assembly Districts 7 and 26. This senate district unites San Joaquin County, divided for assembly purposes between the two constitutent assembly districts. Aside from Stockton, the district is largely agricultural in nature and includes various mountain counties. Stockton is largely oriented to agricultural marketing and processing.

*District 14*: Assembly Districts 27 and 30. This senate district includes the central valley between the City of Modesto, which is entirely within

the district, and the City of Fresno which is partially within the district. Much of the population is near Highway 99 between Modesto and Fresno.

*District 15*: Assembly Districts 31 and 32. This district encompasses the area from Fresno to Delano in northern Kern County including about 30 percent of the population of the City of Fresno and all of Kings and Tulare Counties.

The City of Fresno is divided between Districts 14 and 15. Though a large city, Fresno is oriented to the agricultural interests of the central valley and the agricultural nature of both Districts 14 and 15 should not create any basic antagonism.

*District 16*: Assembly Districts 33 and 34. Except for a small northern portion joined with Tulare County, Kern County is reunited by this pairing which also joins the Mojave Desert region into one district. The district is linked by major freeways and the Southern Pacific and Santa Fe railway mainlines.

*District 17*: Assembly Districts 28 and 29. This district extends along the central California coast from Santa Cruz to Santa Maria.

*District 18*: Assembly Districts 35 and 36. This district includes almost all of Santa Barbara County plus western Ventura County.

*District 19*: Assembly District 37 and 38. This district joins eastern Ventura County and the Newhall area of Los Angeles County with the adjacent areas of the northern and western San Fernando Valley.

*District 20*: Assembly Districts 39 and 40. This district includes most of the eastern San Fernando Valley (e.g., Van Nuys, Pacoima and Reseda).

*District 21*: Assembly Districts 41 and 42. This district includes all of Burbank, Glendale and Pasadena, together with adjacent areas. It rejoins Glendale, which is split between Assembly Districts 41 and 42.

*District 22*: Assembly Districts 43 and 44. This district contains the West Los Angeles and Santa Monica mountain areas, including all of Beverly Hills and Santa Monica.

*District 23*: Assembly Districts 45 and 46. This district contains the area extending from the west side of downtown Los Angeles to the Beverly Hills boundary. It includes the Wilshire, Fairfax, Hollywood, Hollywood Hills, and Silver Lake areas of Los Angeles City.

*District 24*: Assembly Districts 55 and 56. This district covers all of the eastern part of the City of Los Angeles and the large unincorporated com-

munity known as East Los Angeles. A majority of the population has Spanish surnames.

*District 25*: Assembly Districts 61 and 62. This district contains the northern and eastern portion of the San Gabriel Valley and is composed of a number of whole smaller cities such as San Gabriel, Arcadia, Covina and Glendora. The Foothill Freeway runs through most of the proposed senatorial district.

*District 26*: Assembly Districts 59 and 60. This district contains the southern portion of the San Gabriel Valley and is centered on the San Bernardino Freeway. The Pomona Freeway also runs through the western part of the district and is the southern border of its eastern part. The population of the district is about 40 percent Spanish-surnamed.

*District 27*: Assembly Districts 49 and 50. This district is a compact part of the west central area of Los Angeles in the vicinity of the Los Angeles International Airport. The district was over 40 percent black as of 1970, a ratio that is comparable to a present senatorial district located in the same general area.

*District 28*: Assembly Districts 53 and 54. This district includes numerous smaller cities in southern Los Angeles County. The pairing of the constituent assembly districts is supported, in part, by the fact that adjacent assembly districts which form senate districts 30 and 31 are in "corners" of Los Angeles County, and, thus, are not available for alternative pairings.

*District 29*: Assembly Districts 47 and 48. This district in central Los Angeles is compact. A majority of its population is black.

*District 30*: Assembly Districts 51 and 52. This district contains the southwest corner of Los Angeles County, the South Bay, Torrance, Palos Verdes and San Pedro areas. Torrance is reunited within the senate district.

*District 31*: Assembly Districts 57 and 58. This district joins the two assembly districts which are largely made up of all of Long Beach. Being well over 250,000 in population, Long Beach must be divided in assembly district formation.

*District 32*: Assembly Districts 65 and 66. This district encompasses the region from and including Pomona through San Bernardino and, except for the City of Pomona, is located entirely in San Bernardino County.

*District 33*: Assembly Districts 63 and 64. This district includes Downey, Norwalk, Whittier and La Mirada. The relatively lightly populated, but developing, Hacienda Heights and Diamond Bar areas are also included.

The district is served by the San Gabriel River and Pomona Freeways, the latter being, in essence, the northern boundary for most of the district.

*District 34*: Assembly Districts 67 and 68. This district includes much of Riverside County, plus the Highlands and Redlands areas of San Bernardino County. Assembly District 68 is entirely within Riverside County. Assembly District 67 is partially in Riverside and San Bernardino Counties.

*District 35*: Assembly Districts 69 and 70. This district is the northern portion of Orange County, largely northeast of the Santa Ana Freeway. It reunites the bulk of Anaheim divided by the two assembly districts. About 10 percent of the far westerly extension of Anaheim is in Senate District 37.

*District 36*: Assembly Districts 73 and 74. This district covers the entire coastal area of Orange County plus the Camp Pendleton and Oceanside areas of San Diego County. The formation of the district reunites Costa Mesa, divided by the constituent assembly districts.

*District 37*: Assembly Districts 71 and 72. This central interior district, located mainly between the Santa Ana and San Diego Freeways, reunites Garden Grove which is divided by the constituent assembly districts. The only city in Orange County divided by senate districts is Anaheim, the largest city. This division involves less than 10 percent of the population of Anaheim, all located in a western extension of that city.

*District 38*: Assembly Districts 75 and 76. This district contains most of northern and eastern San Diego County plus portions of Riverside County and all of Imperial County. Slightly over half of the population is located in northern San Diego County, in cities such as Escondido, Vista, Carlsbad and Del Mar. This is the least urban portion of San Diego County. There are a number of recreational and retirement communities throughout the district.

*District 39*: Assembly Districts 77 and 78. This district includes the northern portion of the City of San Diego and the suburban communities of La Mesa and El Cajon.

*District 40*: Assembly Districts 79 and 80. This district contains central and southern San Diego and adjacent southern suburbs including National City, Coronado, and Chula Vista.

The districts in the senate plan have been numbered commencing in the north and proceeding to the south as prescribed by the California Constitution (art. IV, § 6). The same numbering system was used for assembly and congressional districts.

In the case of the senate plan, attention was given to assigning an odd or an even number to a particular district because the election of senators in odd numbered districts takes place at one general election and in even numbered districts at the following general election. The assignment of an odd or an even number to a particular district generally was premised on the concept that incumbents should not be. unnecessarily deprived of the opportunity to run for reelection and that large segments of the population who last voted for a senator in 1970 should not be deprived of the opportunity to vote for a senator in 1974.

## CONGRESSIONAL DISTRICTS

In general, formation of the 43 congressional districts proceeded in a manner similar to that used for assembly districts. The state was divided into five basic reapportionment areas similar to those used for assembly district formation. Because of different, and more exacting, population requirements for congressional districts, the ultimate reapportionment areas were not precisely the same.

Further, since assembly districts had already been formed using the recommended criteria, the assembly districts were used as building blocks to the degree feasible. On occasion, a previously developed assembly district was altered slightly so as to maximize the use of the same boundary for the assembly district and congressional district. Though it is impossible to create 43 congressional districts out of 80 assembly districts without some variance in boundaries, it was possible to make assembly and congressional district boundaries congruent in a substantial number of instances in each of the counties which required division.

The maximum spread in population of 2,070 persons between the largest and smallest district is a total variance of only 0.45 percent. No district deviates by as much as even ¼ of 1 percent from the ideal. Owing to the nature of United States Census Bureau data, it would be extremely difficult to reduce these deviations.[21]

A brief description of the recommended congressional districts, together with some of the specific reasons for forming them follows:

*Districts 1 through 4* contain all of Northern California. District 1 includes most of interior California north of Sacramento, plus about 8,000 persons from the Folsom area of Sacramento County who are required to

---

[21]Further purported reductions in the deviations would require massive census tract splitting which would, in all probability, create actual variations in population greater than achieved in this plan. (Cf. *Gaffney* v. *Cummings, supra,* 412 U.S. 735, 744-746 [37 L.Ed.2d 298, 307-308, 93 S.Ct. 2321, 2327-2328].)

equalize population. District 2 contains all of coastal Northern California including the counties of Del Norte, Humboldt, Mendocino, Lake, Napa and all of Sonoma County except 5,000 persons who must be included with Marin County to achieve strict population equality. District 3 is entirely within Sacramento County, and includes the major portion of the county. District 4 includes the lower Sacramento Valley Counties of Colusa, Sutter, Yolo, Solano plus a part of Sacramento County. The westerly part of the northernmost Sacramento County assembly district was used as the District 4 part of Sacramento, thus creating congruent boundaries.

*Districts 5 and 6* include Marin County and San Francisco. District 5 includes all of Marin County and the northernmost assembly district in San Francisco. District 6 consists of the remainder of San Francisco. The congressional district line between these districts is congruent with assembly district lines for about 95 percent of its length.

*Districts 7, 8 and 9* are located in Contra Costa and Alameda Counties. District 7 is wholly within Contra Costa County and, except for the City of El Cerrito and San Ramon Village, is identical to Senate District 7. District 8 is also very similar to Senate District 8 located in the northern Alameda County area. The essential variations are that the City of El Cerrito is included and the City of Alameda is excluded in Congressional District 8. These variations compensate for the smaller size of congressional districts. District 9 is located in central and eastern Alameda County, and is similar to Senate District 9 except the City of Alameda is added and most of the City of Hayward is excluded. A small part of Hayward had to be included in District 9 to achieve population equality.

*Districts 10, 11, 12 and 13* are located in San Mateo, Santa Clara and southern Alameda Counties. District 10 includes most of Hayward and all of Fremont and Union City from Alameda County and the northeastern part of the Santa Clara Valley including the central and eastern parts of San Jose. To the extent practicable, assembly district boundaries in Santa Clara County were used as the boundary of District 10. District 11 is wholly within San Mateo County and includes most of the county, extending from the north boundary to Redwood City. Redwood City is divided between Districts 11 and 12 and is the only city divided in either San Mateo or Santa Clara County except San Jose, which is too large to be included in one district. District 12 contains southern San Mateo County and northwestern Santa Clara County including cities such as Palo Alto, Los Altos, Sunnyvale and Santa Clara. District 13 contains all of Santa Clara County not within Districts 11 or 12, including southern San Jose, numerous smaller suburban cities such as Los Gatos and Cupertino and the agricultural area in the Gilroy region.

*Districts 14, 15, 17 and 18* are located in central interior California. District 14 includes the rural part of Sacramento County, San Joaquin County, Stanislaus County except for Modesto and Turlock, and six mountain counties. District 15 is located immediately south of District 14, and runs from Modesto to Fresno, including parts of Stanislaus and Fresno Counties and all of Madera and Mariposa Counties. The City of Fresno is divided between Districts 15 and 17, using, in large measure, the assembly district boundary through the city. No practicable way of creating reasonably compact districts could be devised in the central valley without dividing the City of Fresno. District 17 includes the part of Fresno County not in District 15 and Kings County and most of Tulare County. The southern part of Tulare County must be joined with Kern County in forming District 18 to achieve the required population equalization. In addition to Kern County and the southern part of Tulare County, District 18 includes Inyo County and the Antelope Valley portion of nothern Los Angeles County. The Antelope Valley is an extension of the Mojave Desert, located in Los Angeles and Kern Counties. Thus the Los Angeles portion of this valley is a logical addition to a Kern County-centered congressional district which requires additional population.

*Districts 16, 19 and 20* are located along the central California coast north of Los Angeles. District 16 includes all of Santa Cruz, San Benito and Monterey Counties and the northern two-thirds of San Luis Obispo County. Population equalization requirements dictate the division of San Luis Obispo County just south of the City of San Luis Obispo. District 19 includes the southern part of San Luis Obispo County, all of Santa Barbara County and the western part of Ventura County. The cities of Ventura and Ojai and over 90 percent of Oxnard are located within District 19. Once again, strict population equality requirements necessitated a division of a city. District 20 contains eastern Ventura County, including the remaining portion of Oxnard and the Cities of Simi Valley, Thousand Oaks, Camarillo and Santa Paula. The district also includes the western fringes of the San Fernando Valley, and the Malibu-Calabasas and Newhall areas of Los Angeles County. Much of the eastern part of Ventura County included in the district is closely related to Los Angeles. Census figures show that a majority of the employed residents of both Simi Valley and Thousand Oaks work in Los Angeles County.

*District 21* is the eastern and northern part of the San Fernando Valley. The district boundaries are largely congruent with assembly district boundaries in the area.

*District 22* is almost identical in boundaries to Senate District 21. The district includes Burbank, Glendale and most of Pasadena. It varies from Senate District 21 only in that it does not include the City of South Pasadena and a small portion of eastern Pasadena must be removed to equalize population.

*Districts 23, 24 and 25* include much of the Santa Monica mountain area in the City of Los Angeles and most of the central area of the city. District 23 contains the southern portion of the San Fernando Valley, primarily in the Encino and Reseda areas; and the Brentwood, Westwood and Rancho Park areas of the City of Los Angeles. It also includes all of the City of Beverly Hills. The San Fernando Valley and West Los Angeles parts of the district are connected by the San Diego Freeway. District 24 is located between downtown Los Angeles and Beverly Hills and includes the Wilshire, Fairfax, Hollywood, Studio City and Silver Lake areas of the City of Los Angeles. District 25 contains the downtown area of the City of Los Angeles plus all of the eastern part of the city, including the Eagle Rock, Lincoln Heights and Boyle Heights areas. It also includes most of the unincorporated area known as East Los Angeles. A majority of its population have Spanish surnames.

*District 27* is entirely coastal in orientation, and includes all of the Santa Monica Bay shoreline from Pacific Palisades to the Palos Verdes Peninsula. Accordingly it is rather elongated. However, local residents of each party favored a district with such an orientation. All smaller coastal cities have been included intact in the district. The City of Torrance, which borders the coast at its southwestern corner but which has a substantial part of its population located inland, is divided. Only the coastal portion is included in District 27.

*Districts 26 and 30* include most of the San Gabriel Valley. District 26 includes the northern and eastern cities extending from Alhambra and South Pasadena on the west through Glendora on the east. The small part of Pasadena not included in District 21 is also included in this district. The Foothill Freeway is a major traffic artery serving the eastern two-thirds of the district. District 30 contains the southern part of the San Gabriel Valley and includes a number of smaller cities such as Monterey Park, Montebello, Pico Rivera, El Monte and La Puente. No cities are divided by the district. Over 40 percent of the population of the district have Spanish surnames.

*Districts 28 and 29* are located in south central Los Angeles City and include various cities adjacent to this part of Los Angeles. District 28 is the more westerly. It includes the cities of Inglewood and Culver City and the Mar Vista, Crenshaw and Baldwin Hills areas of Los Angeles. Over 40 percent of the population of the district is black. District 29 is located directly east of District 28 and shares many boundaries in common with Senate District 29. A majority of the population of the district is black. No cities are divided by the district.

*Districts 31 and 32* include a number of smaller cities just south of the major part of Los Angeles, plus the Wilmington and San Pedro areas of the City of Los Angeles. District 31 includes several smaller cities, Hawthorne, Gardena, Compton, Lynwood and Paramount and the northeastern part of Torrance, which is divided from the rest of the city by a large oil refinery complex. Many of the boundaries of this district are congruent with assembly district boundaries in the area. District 32 is a square-shaped district including the San Pedro and Wilmington areas of Los Angeles, the City of Carson, the southeast part of Torrance and the western half of the City of Long Beach.

*District 33* is formed substantially by use of the boundaries of Senate District 33, with small parts of the eastern and southwestern territory removed to achieve population equality. To do so it was necessary to divide the City of Cerritos, which has a peculiar jaw-shaped boundary which almost surrounds the City of Artesia.

*District 34* contains the southeastern corner of Los Angeles County including all of Bellflower, Lakewood and Artesia and the eastern half of Long Beach. The north coastal portion of Orange County, adjacent to eastern Long Beach is also included in the district. This Orange County Coastal area includes Seal Beach and about half of Huntington Beach.

*Districts 35, 36 and 37* include the easternmost part of Los Angeles County, all of San Bernardino County and most of Riverside County. District 35 is centered in, and includes all of the Pomona Valley which is located in both eastern Los Angeles and western San Bernardino Counties. To obtain the necessary population, the Cities of Covina and West Covina, just west of the Pomona Valley are also included in the district. The sparsely populated part of the San Gabriel mountains just north of the populated areas of the district is also included in the district. District 36 contains the urban portions of San Bernardino and Riverside Counties, including all of the Cities of Riverside, Colton, Rialto and Fontana and most of the City of San Bernardino. The district boundaries are entirely con-

gruent with assembly district boundaries in Riverside County and substantially congruent in San Bernardino County. District 37 contains the outer suburban, rural, mountain and desert areas of San Bernardino and Riverside Counties. It includes the cities of Redlands, Beaumont, Palm Springs, Indio, Victorville and Barstow and a small part of northeastern San Bernardino City.

*Districts 38, 39 and 40* are located in Orange County. District 38 was formed by using the boundaries of Senate District 37, with a small part of the City of Santa Ana removed to achieve the required population equality. In this manner congruent congressional and assembly district lines were maximized and all of the smaller cities of north central Orange County, such as Stanton, Cypress, La Palma, Buena Park, Los Alamitos and Westminster were retained in one district. Similarly, District 39 was formed by using the boundaries of Senate District 35. The City of Tustin adjacent to the portion of Santa Ana removed in forming Congressional District 38 was deleted to achieve the necessary population equality. District 40 contains the southern part of Orange County and a small part of northern San Diego County. The San Diego boundary is congruent with the assembly district boundary in the same area.

*Districts 41, 42 and 43* are located in San Diego and Imperial Counties. A small portion of southern Riverside County in the Perris and Lake Elsinore area is also included to achieve population equality. District 42 is the southwest corner of San Diego County. Its boundaries are largely congruent with Senate District 40, and it includes the central San Diego area and southern suburban cities such as National City, Chula Vista and Coronado. District 41 contains the northern part of the City of San Diego including the Point Loma, Clairemont Mesa and Mission Valley areas together with the City of La Mesa. This district shares many boundaries with Senate District 39. District 43 includes most of northern San Diego, including beach communities such as Del Mar and Carlsbad, and interior cities such as El Cajon and Escondido. Rural eastern San Diego County and Imperial County are also within the district.

In formulating these plans the Masters were aware of the observations of the United States Supreme Court that "Districting inevitably has sharp political impact and inevitably political decisions must be made by those charged with the task" (*White* v. *Weiser, supra,* 412 U.S. pp. 795-796 [37 L.Ed.2d p. 346, 93 S.Ct. p. 2355]), and that "Politics and political considerations are inseparable from districting and apportionment," and dis-

tricting without regard for political impact "may produce, whether intended or not, the most grossly gerrymandered results" (*Gaffney* v. *Cummings, supra,* 412 U.S. 735, 753 [37 L.Ed.2d 298, 312, 93 S.Ct. 2321, 2331, 2332]). It is also true that political fairness is an appropriate goal of reapportionment (*Gaffney* v. *Cummings, supra*) and that there are legitimate interests to be served by allowing incumbents and their constituents to maintain existing relationships and in affording incumbents fair opportunities to seek reelection. Accordingly, it was deemed appropriate to consider whether the recommended plans are politically fair and whether they needlessly prejudice the legitimate interests of incumbents and their constituents.

Testing for political fairness is at best an imprecise endeavor. Techniques employed in other states and mentioned in some decisions are not practical in California where there have been major population shifts and where traditionally and historically voters have demonstrated more political independence than voters elsewhere. However, with general measuring devices such as party registration and such electoral data as is available it should be possible to detect a redistricting plan likely to produce a manifestly unfair political result. On the basis of such testing it appears that the proposed and recommended plans are neither politically unfair nor unfair to incumbents, but may result in fewer "safe seats" and more "competitive seats."

Political science literature suggests that the most effective means of avoiding the creation of constituencies that unduly favor one of the political parties is to create an appropriate number of competitive districts.[22] The typical legislative approach is to maximize safe seats for both parties. Ideal districting should accommodate shifting political trends, allowing electoral majorities to be represented by legislative majorities. The central rationale of two party politics is that it offers voters alternative choices of candidates and programs. According to democratic theory, parties should contest for public support through electoral mechanisms that translate predominant public opinion into public policy. This involves the ability of popularly elected majorities to govern, while insuring the representation of the minority party, temporarily out of power, as a check on a usually transitory majority party.

The Masters are aware that there are instances where the places of residence of some incumbents under the recommended plans will not be lo-

---

[22]See, e.g., *Reapportionment in the 1970s* (N. Polsby ed. 1971).

cated within the districts they formerly represented in large part and it will be necessary for them to change their residences if they wish to seek re-election in the areas encompassed within their former districts. This is because the increase in population and shift in the centers of population have caused a change in the size and configuration of districts. It is an unfortunate but necessary result that population shifts and adherence to objective criteria bring about inconvenience to some incumbents in order that the citizens generally may benefit.

If it turns out that the new district lines are not announced by the Court in time for incumbent legislators and other candidates to select a residence and become an elector in a district "for one year . . . immediately pre-ceding" the election (Cal. Const., art. IV, § 2, subd. (c)), it is recommended that the Court give consideration to an interpretation that the cited section is inapplicable to such tardily formed districts so as to permit candidates to file for election if they are residents of the district at the time of filing and otherwise comply with election law requirements.

A request has been received from the University of California Institute of Governmental Studies in Berkeley that its facilities be used as a deposi-tory of all material lodged with the Masters, with the understanding that the materials received will be safely stored, catalogued and made available for public and scholarly use. It is recommended, when the judgments in these actions become final, that pertinent materials that have been lodged with the Masters be released to the Institute of Governmental Studies for storing and use as requested, upon the conditions noted.

Respectfully submitted August 31, 1973.

MARTIN J. COUGHLIN
Martin J. Coughlin, Presiding Master

ALVIN E. WEINBERGER
Alvin E. Weinberger, Special Master

HAROLD F. COLLINS
Harold F. Collins, Special Master

Appendix A to the Report of the Masters setting forth the legal descriptions of the districts and Appendix C to the Report of the Masters containing maps of the districts are on file with the Clerk of the Court.

Appendix B to the Report of the Masters follows:

### POPULATIONS OF ASSEMBLY DISTRICTS
#### (Ideal Size: 249,661)

| Assembly District | Population | Variation From Ideal | Assembly District | Population | Variation From Ideal |
|---|---|---|---|---|---|
| 1 | 254,507 | +1.94% | 41 | 249,306 | —0.14% |
| 2 | 250,797 | +0.46 | 42 | 251,399 | +0.70 |
| 3 | 254,396 | +1.90 | 43 | 250,961 | +0.52 |
| 4 | 248,206 | —0.58 | 44 | 250,807 | +0.46 |
| 5 | 249,169 | —0.20 | 45 | 250,443 | +0.31 |
| 6 | 247,909 | —0.70 | 46 | 247,383 | —0.91 |
| 7 | 251,941 | +0.91 | 47 | 250,299 | +0.26 |
| 8 | 249,525 | —0.05 | 48 | 248,050 | —0.65 |
| 9 | 251,699 | +0.82 | 49 | 251,477 | +0.73 |
| 10 | 251,015 | +0.54 | 50 | 251,160 | +0.60 |
| 11 | 248,365 | —0.52 | 51 | 248,755 | —0.36 |
| 12 | 249,176 | —0.19 | 52 | 249,756 | +0.04 |
| 13 | 250,437 | +0.31 | 53 | 251,459 | +0.72 |
| 14 | 250,747 | +0.43 | 54 | 248,046 | —0.65 |
| 15 | 251,227 | +0.63 | 55 | 250,173 | +0.21 |
| 16 | 249,922 | +0.10 | 56 | 251,789 | +0.85 |
| 17 | 248,599 | —0.43 | 57 | 251,951 | +0.92 |
| 18 | 248,430 | —0.49 | 58 | 251,438 | +0.71 |
| 19 | 247,794 | —0.75 | 59 | 251,657 | +0.80 |
| 20 | 248,987 | —0.27 | 60 | 249,568 | —0.04 |
| 21 | 248,178 | —0.59 | 61 | 247,803 | —0.74 |
| 22 | 248,448 | —0.49 | 62 | 248,898 | —0.31 |
| 23 | 248,250 | —0.57 | 63 | 247,445 | —0.89 |
| 24 | 247,557 | —0.84 | 64 | 248,766 | —0.36 |
| 25 | 248,302 | —0.54 | 65 | 251,882 | +0.89 |
| 26 | 251,681 | +0.81 | 66 | 247,713 | —0.78 |
| 27 | 251,437 | +0.71 | 67 | 247,690 | —0.79 |
| 28 | 251,144 | +0.59 | 68 | 249,045 | —0.89 |
| 29 | 244,928 | —1.90 | 69 | 247,451 | —0.98 |
| 30 | 250,185 | +0.21 | 70 | 247,214 | —0.98 |
| 31 | 249,389 | —0.11 | 71 | 250,253 | +0.24 |
| 32 | 248,754 | —0.36 | 72 | 249,415 | —0.10 |
| 33 | 249,170 | —0.20 | 73 | 249,086 | —0.23 |
| 34 | 249,245 | —0.17 | 74 | 248,103 | —0.62 |
| 35 | 245,183 | —1.79 | 75 | 249,025 | —0.25 |
| 36 | 249,062 | —0.24 | 76 | 250,554 | +0.36 |
| 37 | 251,656 | +0.80 | 77 | 249,390 | —0.11 |
| 38 | 250,411 | +0.30 | 78 | 252,055 | +0.96 |
| 39 | 249,301 | —0.14 | 79 | 250,036 | +0.15 |
| 40 | 248,252 | —0.56 | 80 | 251,800 | +0.86 |

## POPULATION OF SENATORIAL DISTRICTS
### (Ideal Size: 499,322)

| Senate District | Population | Variation From Ideal | Senate District | Population | Variation From Ideal |
|---|---|---|---|---|---|
| 1 | 508,903 | +1.92% | 21 | 500,705 | +0.28% |
| 2 | 502,496 | +0.64 | 22 | 501,768 | +0.49 |
| 3 | 497,078 | —0.45 | 23 | 497,826 | —0.30 |
| 4 | 497,731 | —0.32 | 24 | 501,962 | +0.53 |
| 5 | 498,521 | —0.16 | 25 | 496,701 | —0.52 |
| 6 | 496,224 | —0.62 | 26 | 501,225 | +0.38 |
| 7 | 499,380 | +0.01 | 27 | 502,637 | +0.66 |
| 8 | 499,613 | +0.06 | 28 | 499,505 | +0.04 |
| 9 | 501,974 | +0.53 | 29 | 498,349 | —0.19 |
| 10 | 497,165 | —0.43 | 30 | 498,511 | —0.16 |
| 11 | 495,859 | —0.69 | 31 | 503,389 | +0.81 |
| 12 | 496,698 | —0.53 | 32 | 499,595 | +0.05 |
| 13 | 503,622 | +0.86 | 33 | 496,211 | —0.62 |
| 14 | 501,622 | +0.46 | 34 | 496,735 | —0.52 |
| 15 | 498,143 | —0.24 | 35 | 494,665 | —0.93 |
| 16 | 498,415 | —0.18 | 36 | 497,189 | —0.43 |
| 17 | 496,072 | —0.65 | 37 | 499,668 | +0.07 |
| 18 | 494,245 | —1.02 | 38 | 499,579 | +0.05 |
| 19 | 502,067 | +0.55 | 39 | 501,445 | +0.43 |
| 20 | 497,553 | —0.35 | 40 | 501,836 | +0.50 |

## POPULATION OF CONGRESSIONAL DISTRICTS
### (Ideal Population: 464,486)

| Congressional Districts | Population | Variation From Ideal | Congressional Districts | Population | Variation From Ideal |
|---|---|---|---|---|---|
| 1 | 464,160 | — .07% | 23 | 464,792 | + .07% |
| 2 | 464,334 | — .03 | 24 | 464,709 | + .05 |
| 3 | 464,399 | — .02 | 25 | 464,672 | + .04 |
| 4 | 464,182 | — .07 | 26 | 464,450 | — .01 |
| 5 | 463,523 | — .21 | 27 | 464,413 | — .02 |
| 6 | 463,521 | — .21 | 28 | 465,065 | + .12 |
| 7 | 464,283 | — .04 | 29 | 464,125 | — .08 |
| 8 | 464,691 | + .04 | 30 | 464,765 | + .06 |
| 9 | 464,552 | + .01 | 31 | 464,422 | — .01 |
| 10 | 464,159 | — .07 | 32 | 465,166 | + .15 |
| 11 | 464,287 | — .04 | 33 | 464,505 | + .00 |
| 12 | 464,581 | + .02 | 34 | 464,669 | + .04 |
| 13 | 464,980 | + .10 | 35 | 463,819 | — .14 |
| 14 | 464,696 | + .05 | 36 | 464,117 | — .08 |
| 15 | 465,591 | + .24 | 37 | 464,626 | + .03 |
| 16 | 465,345 | + .18 | 38 | 463,921 | — .12 |
| 17 | 464,883 | + .09 | 39 | 464,452 | — .01 |
| 18 | 464,421 | — .01 | 40 | 464,212 | — .06 |
| 19 | 464,360 | — .03 | 41 | 464,052 | — .09 |
| 20 | 464,759 | + .06 | 42 | 464,208 | — .06 |
| 21 | 464,934 | + .10 | 43 | 464,319 | — .04 |
| 22 | 464,760 | + .06 | | | |

A brief statistical summary of the various proposals recommended herein is as follows:

A.

| | Assembly | Senate | Congress |
|---|---|---|---|
| Ideal District Size | 249,661 | 499,322 | 464,486 |
| Largest District | | | |
| Population | 254,507 | 508,903 | 465,591 |
| Variation from ideal | +1.94% | +1.92% | +0.24% |
| Smallest District | | | |
| Population | 244,928 | 494,245 | 463,521 |
| Variation from ideal | —1.90% | —1.02% | —0.21% |
| Total Range of Deviation | 3.73% | 2.94% | 0.45% |
| Average Deviation | .58% | .46% | .07% |
| Number of State Legislative Districts varying from the ideal by more than 1% | 4 | 2 | |

B. Cities under 250,000 in population divided by Legislative Districts:

*Assembly*:

| City | Population | Percentage of Population in One District |
|---|---|---|
| Concord | 85,164 | 95 |
| Sunnyvale | 95,408 | 91 |
| Oceanside | 40,494 | 89 |
| Costa Mesa | 72,660 | 83 |
| Stockton | 109,963 | 79 |
| San Bernardino | 104,251 | 78 |
| Glendale | 132,752 | 77 |
| Fresno | 165,972 | 71 |
| Garden Grove | 121,852 | 70 |
| San Mateo | 78,991 | 70 |
| Menlo Park | 26,734 | 61 |
| Daly City | 66,922 | 61 |
| Berkeley | 116,716 | 60 |
| Santa Maria | 32,749 | 56 |
| Anaheim | 162,332 | 55 |
| Carson | 71,150 | 52 |

*Senate*:

| City | Population | Percentage of Population in One District |
|---|---|---|
| Anaheim | 162,332 | 92 |
| Sunnyvale | see above | |
| Oceanside | see above | |
| San Bernardino | see above | |
| Fresno | see above | |
| San Mateo | see above | |
| Santa Maria | see above | |
| Carson | see above | |

*Congress*:

| City | Population | Percentage of Population in One District |
|---|---|---|
| Oxnard | 71,225 | 93 |
| Hayward | 93,058 | 93 |
| Pasadena | 113,327 | 91 |
| Oceanside | 40,494 | 89 |
| Santa Ana | 155,525 | 78 |
| Redwood City | 55,686 | 74 |
| Cerritos | 15,856 | 71 |
| San Bernardino | 104,251 | 69 |
| Fresno | 165,972 | 64 |
| Huntington Beach | 115,960 | 50 |
| Torrance | 134,584 | 49 |

NOTE: There are 400 incorporated cities in California under 250,000 population (plus 7 cities over 250,000 population). This compilation does not include any minor divisions which may have resulted from following census tract lines in areas where city lines are very irregular, or divisions which do not divide populations.

| | Assembly | Senate | Congress |
|---|---|---|---|
| Number of Cities Divided | 16 | 8 | 11 |
| Number of Cities wherein less than 75% of City is within any single Legislative District | 9 | 4 | 6 |

Number of counties under 250,000 in population divided by legislative districts:

*Assembly*:

| County | Population | Largest % of the County Within One District |
|---|---|---|
| Merced | 104,629 | 93 |
| Tulare | 188,322 | 83 |
| Stanislaus | 194,506 | 78 |
| Monterey | 247,450 | 55 |
| Butte | 101,969 | 52 |
| Sonoma | 204,885 | 45 |

*Senate*:

| | | |
|---|---|---|
| Stanislaus | 194,506 | 78 |
| Sonoma | 204,885 | 55 |

*Congress*:

| | | |
|---|---|---|
| Sonoma | 204,885 | 98 |
| Tulare | 188,322 | 89 |
| San Luis Obispo | 105,690 | 72 |
| Stanislaus | 194,506 | 68 |

NOTE: 43 of the 58 counties of California are under 250,000 in population.